IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION** | : : : : | **MDL DOCKET NO. 1586** |
| **IN RE COLUMBIA, JANUS, MFS, ONE GROUP, PUTNAM** | : : : | **Civil No. 04-md-15863 (JFM)** |
| **This Document Relates to the Janus Subtrack** | : : : : : : | |
| *Steinberg et al v. Janus Capital Management, LLC et al* | : : : | CIVIL NO. 04-cv-00518 (D.Md.) |

## CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT

## **TABLE OF CONTENTS**

I.      SUMMARY OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE .............................................................................6

III.    PARTIES ...............................................................................................................7

        Plaintiffs ...............................................................................................................7

        Defendants ..........................................................................................................10

        (a)     Janus Defendants ...................................................................................10

        (b)     Janus Non-Party Participants .................................................................12

                Officers ..................................................................................................12

                Trustees ..................................................................................................13

                (a)     The Parent Company ...................................................................16

                (b)     The Trusts ...................................................................................16

                (c)     The Boards of Trustees ...............................................................17

                (d)     The Investment Adviser ..............................................................18

                (e)     The Sub-Advisers ........................................................................18

                (f)     The Distributor ............................................................................19

        Additional Defendants .......................................................................................19

        Timer Defendants ...............................................................................................22

        Nominal Defendants ...........................................................................................23

IV.     STATEMENT OF FACTS ...................................................................................23

        A.      General Factual Background ...................................................................23

                (1)     Introduction ................................................................................23

(2)      NAV Pricing .................................................................................25

(3)      Market Timing Transactions.........................................................26

(4)      Late Trading.................................................................................28

(5)      Mutual Fund "Short Selling" Strategy .........................................31

(6)      Market Timing Is Easy to Detect
         and Has Been Well-Known Since 1997.........................................32

(7)      Market Timing Arrangements.......................................................36

         Banc of America Securities LLC ................................................40

         Aurum Defendants, Trautman, and Pritchard .............................45

         Canary .......................................................................................49

(8)      Impact of Market Timing .............................................................50

B.    The Janus Fund Families ........................................................................54

(1)      The Janus Defendants' Knowledge
         and Participation in the Market Timing Scheme ..........................54

         The 2002 Reports........................................................................59

         Janus' Ability to Catch Timing...................................................61

(2)      The Janus Market Timing Initiative.............................................64

         Personal Profits to Managers .....................................................68

(3)      Janus' Settlement with the Regulators.........................................69

(4)      Trautman Times the Janus Funds with Permission.......................71

(5)      Canary Times Janus "Under the Wire".........................................75

(6)      Canary's Negotiated Timing in Janus...........................................77

(7)      Security Trust Corporation Times the Janus Funds.......................80

(8)      Smith Barney Times the Janus Funds...........................................81

(9)  CIBC Times the Janus Funds ................................................................82

(10)  Haidar Capital Management Times the Janus Funds ................................83

(11)  Timing Policies Disclosed in the Janus Prospectuses ............................84

Purchases .................................................................................................84

Redemptions ...........................................................................................86

Excessive Trading ...................................................................................87

Exchanges ...............................................................................................91

Pricing Of Fund Shares ..........................................................................94

Involuntary Redemptions ........................................................................95

(12)  The Janus Trust Declarations ...................................................................95

(13)  The Janus Advisory Contracts .................................................................95

Sub-Advisor Agreements ........................................................................96

(14)  Distributor Contracts ...............................................................................97

(15)  Administrator Contracts ...........................................................................97

(16)  Repercussions to the Janus Funds from Timing .......................................98

(17)  Fees on Janus Funds ................................................................................99

Advisory and Administrative Fees ..........................................................101

Standing ..................................................................................................104

V.     DEMAND FUTILITY ALLEGATIONS .................................................................104

COUNT I
VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT .....................111

COUNT II
VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT......................114

COUNT III
VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT.........................117

CAFDC:  04-md-15863-03

COUNT IV
VIOLATION OF SECTIONS 206 AND 215 OF THE INVESTMENT ADVISERS ACT.......117

COUNT V
CONTROL PERSON LIABILITY UNDER SECTION 48 OF
THE INVESTMENT COMPANY ACT ...................................................................................119

COUNT VI
COMMON LAW BREACH OF FIDUCIARY DUTY.............................................................120

COUNT VII
BREACH OF CONTRACT.......................................................................................................121

COUNT VIII
BREACH OF CONTRACT.......................................................................................................124

COUNT IX
AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ............................................125

COUNT X
UNJUST ENRICHMENT .........................................................................................................126

COUNT XI
COMMON LAW INTERFERENCE WITH CONTRACT .......................................................127

COUNT XII
CIVIL CONSPIRACY...............................................................................................................128

Plaintiffs, George Tsetsekos, Gloria Steinberg, Michael Gaines, Sharon Gaines, Sylvia Volin, Erik P. Gagnon, Lauri C. Bader, Custodian for Emily Bader, UTMA, Reiko Gagnon, Mark J. Keane, Roger Bailey, Katharine Clark, Jean Stigas, Lawrence A. Stigas, Doneen Duke, Robin Resnick, Jason Hung, Mei Hung, Gerald Chait, Sherry Chait, Robert K. Finnell, Rhonda Vladimir, James E. Schultz, Michael Lipstein, Joseph Corclani and Barbara Corclani, derivatively, on behalf of the mutual fund comprising the Janus Funds complain against the Defendants as follows:

## I.    **SUMMARY OF THE ACTION**

1.    This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.    This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others, and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care. This Complaint also seeks redress for the harm caused by the Trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

CAFDC:  04-md-15863-03

3.      Market timing and late trading have been extremely harmful to the Funds.  Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds.  Market timing also causes serious, known disruptions to mutual funds and their operations.  Market timing forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position – cash that otherwise should be used to invest.  Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the Fund.  The effect of this is to reduce the returns earned by the Funds.

4.      Market timing and late trading have harmed each and every Fund in the Janus family of mutual funds, whether or not the particular Fund was the direct victim of market timing or late trading.  This is so because some expenses, such service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and late trading may be shared among all Funds in the Janus family, including timed-funds and non-timed funds alike.  This is also so because investors have fled all the Funds in the Janus family of mutual funds, not just the timed funds,  following the public disclosure of the market timing and late trading scandal.

5.      Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter market timing, including redemption penalties.

6.      Conversely, market timing and late trading have been extremely profitable for market timers, and, moreover, impose little risk.  Because the price movement of the underlying

securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet. Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

7.    Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves. Thus, for example, a one day trade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off on the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

8.    Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities, which are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.    In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they permitted, facilitated, encouraged or participated in the improper activity. At a minimum, the advisors failed to detect and/or prevent, market timing and late trading in the Funds – the types of abusive transactions they were

obligated to prevent. Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.    Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds. As William H. Donaldson, Chairman of the Securities and Exchange Commission ("SEC"), recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles. It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment advisers and their advised funds. As fiduciaries, advisers owe their clients more than mere honesty and good faith. Recent experience suggests that all too many advisers were delivering much less.[1]

11.    The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds. Those conflicts of interest have manifested themselves in widespread instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

12.    The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the Funds were known by certain of the trustees of the Funds, who nonetheless approved or ratified the Fund adviser's management agreements each year, and were not adequately disclosed to or understood by other trustees of the Funds, who approved or ratified the Fund adviser's management agreements each year despite the harm the adviser caused or permitted to the Funds, and who approved or ratified plans permitting the

---

[1]    Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

CAFDC:  04-md-15863-03

adviser to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the trustees' own duties to the Funds.

13.    This action is brought by shareholders of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing.  These damages include, but are not limited to:

(a)    forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

(b)    damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)    damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)    Damages to the Funds for 12b-1 fees paid to the Fund Adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.    This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(a)    rescission of the adviser's management and other agreements with the Funds;

(b)    rescission of the 12b-1 Plans adopted by the Funds;

CAFDC:  04-md-15863-03

5

(c)     removal of the Fund adviser and its affiliates that manage and perform other services for the Funds; and

(d)     removal of each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees.

## II.     <u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein because they arise out of and are part of the same case or controversy as plaintiffs' federal claims.

17.     Venue is proper in the transferor districts because some or all of the Defendants are incorporated or conduct business in and/or some of the wrongful acts alleged herein took place or originated in those judicial districts.  Venue is also proper in this District of Maryland because some of the wrongful acts alleged herein took place or originated in this judicial district.

18.     In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*, MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To preserve the filing dates of the original complaints for purposes of any applicable statutes of limitation and all other defenses based upon the passage of time, the plaintiffs herein expressly

reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

## III.    PARTIES

20.    The **"Plaintiffs"** were owners and holders of investments in the Janus Funds at relevant times to this Complaint.  The Plaintiffs are as follows:

(a)    *Plaintiff Katharine Clark*, a resident of Maynard, MA, purchased shares of Janus Aspen MidCap Growth Portfolio and Janus Aspen Worldwide and continues to hold such shares.  Both these Funds are held by the Janus Aspen Series family of funds, or trust.

(b)    *Plaintiffs Reiko Gagnon and Mark J. Keane*, purchased shares of Janus Balanced Fund, Janus Fund, Janus Growth and Income Fund, Janus Mercury Fund, Janus Money Market Fund, Janus Special Equity Fund, Janus Strategic Value Fund and Janus Twenty Fund and continues to hold such shares.  The Janus Mercury Fund is held by the Janus Investment Fund family of funds, or trust.

(c)    *Plaintiff Erik P. Gagnon*, purchased shares of Janus Global Technology Fund and Janus Olympus Fund and continues to hold such shares.

(d)    *Plaintiff Jean Stigas*, a resident of Avon, Massachusetts, purchased shares of Janus Capital Appreciation Fund.  This Fund is held by the Janus Adviser Series family of funds, or trusts.

(e)    *Plaintiff Lawrence A. Stigas*, a resident of Avon, Massachusetts, purchased shares of Janus Focused 30 and Janus Growth LT and continues to hold such shares.

(f)    *Plaintiff Michael Gaines*, a resident of Collierville, Tennessee, purchased shares of Janus Global Life Sciences Fund and Janus Twenty Fund and continues to hold such shares.

CAFDC:  04-md-15863-03

(g)    *Plaintiff Sharon Gaines*, a resident of Collierville, Tennessee, purchased shares of Janus Mercury Fund, Janus Twenty Fund, Janus Olympus Fund, and Janus Worldwide Fund and continues to hold such shares.

(h)    *Plaintiff Michael Gaines*, as custodian for Joby McKale Gaines, purchased shares of Janus Enterprise Fund, Janus Global Life Sciences Fund, Janus Global technology Fund, Janus Olympus Fund and Janus Twenty Fund and continues to hold such shares.

(i)    *Plaintiff Michael Gaines*, as custodian for Sarah Grace Gaines, purchased Janus Enterprise Fund, Janus Global Life Sciences Fund, Janus Olympus Fund, Janus Technology Fund, and Janus Twenty Fund and continues to hold such shares.

(j)    *Plaintiff George Tsetsekos*, a resident of Devon, Pennsylvania, purchased shares of Janus Mercury Fund and continues to hold such shares.

(k)    *Plaintiff George Tsetsekos*, as custodian for Yanni Tsetsekos, purchased shares of Janus Enterprise Fund and continues to hold such shares

(l)    *Plaintiff Sylvia Volin*, a resident of Tenafly, New Jersey, purchased shares of Janus Enterprise Fund, Janus Global Life Sciences Fund, Janus Growth & Income Fund, Janus Mercury Fund, Janus Worldwide Fund and Janus Twenty Fund and continues to hold such shares.

(m)    *Plaintiff Lauri C. Bader*, as custodian for Emily Bader, purchased shares of Janus Fund and continues to hold such shares.

(n)    *Plaintiff Doreen Duke*, purchased shares of Janus Fund and Janus Mercury Fund and continues to hold such shares.

(o)    *Plaintiff Robin Resnick*, a resident of Philadelphia, Pennsylvania, purchased shares of Janus Fund and continues to hold such shares.

CAFDC:  04-md-15863-03

(p)     *Plaintiff Gloria Steinberg*, a resident of Narberth, Pennsylvania, purchased shares of Janus Global Technology Fund and Janus Twenty Fund and continues to hold such shares.

(q)     *Plaintiffs Jason Hung and Mei Hung*, purchased shares of Janus High Yield Fund and continue to hold such shares.

(r)     *Plaintiffs Gerald Chait and Sherry Chait*, purchased shares of Janus Mercury Fund and continues to hold such shares.

(s)     *Plaintiff Robert K. Finnell*, a resident of Rome, Georgia purchased shares of Janus Small Cap Value Fund and continues to hold such shares.

(t)     *Plaintiff Rhonda Vladimir,* a resident of Northport, New York, purchased shares of Janus Balanced Fund and Janus Fund and continues to hold such shares.

(u)     *Plaintiff James E. Schultz* purchased Janus Mercury Fund, Janus Olympus Fund and Janus Overseas Fund and continues to hold such shares.

(v)     *Plaintiff Michael Lipstein*, a resident of Brooklyn, New York purchased shares of Janus Mercury Fund and continues to hold such shares.

(w)     *Plaintiffs Joseph and Barbara Cordani*, residents of Torrington, Connecticut, purchased shares of Janus Worldwide Fund and continue to hold such shares

(u)     *Plaintiff Roger Bailey*, purchased shares of Mercury Growth Value and continues to hold such shares.[2]

---

[2]     Plaintiffs Tsetsekos, Volin, Duke, Steinberg, Hung, Chait and Sharon Gaines filed verifications with their original complaint in the transfer courts.  For a complete list of citations of transferred *see* Exhibit A attached.

CAFDC:  04-md-15863-03

21.    The **"Defendants"** are as follows:[3]

(a)    The **"Janus Defendants"** are the entities which manage and advise the Janus Funds:

(i)    *Defendant Janus Capital Group, Inc.* ("Janus") is a publicly held Delaware corporation with its headquarters in Denver, Colorado.  Janus owns, either entirely or a majority controlling interest in each of the other Janus Defendants.  Janus sponsors, markets and provides investment advisory, distribution and administrative services to mutual funds in both domestic and international markets.  As of May 31, 2003, Janus, through its subsidiaries managed $147.4 billion in assets across multiple investment disciplines.

(ii)    *Defendant Janus Capital Management LLC,* ("JCM" or the "Adviser"), is by contract with Janus the current adviser to all of the Janus Funds. JCM is one of the largest equity managers in the United States, specializing primarily in growth, core and international equity investing.  JCM is 95% owned by Janus with the balance owned by Janus Management Holdings Corporation.  Janus Capital Corporation ("JCC" or "Former-Adviser"*)* was the Adviser to the Funds until April 2002, when it formed JCM as its wholly owned subsidiary and JCM took over the Adviser contracts with the Funds.  JCM assumed all of the responsibilities of JCC and since April 2002, has been responsible for the day-to-day management of investment portfolios and other business affairs of the Funds. JCM, either directly or through the Sub-Advisers (see below) furnishes advice and recommendations concerning investments, administrative, compliance and accounting services.  JCM pays itself a management fee which is calculated daily and paid monthly based upon a percentage of assets

---

[3]    A chart listing Defendants who are new, dropped, or existing with respect to the Lead Fund Derivative case *Steinberg et al. v. Janus Capital Management, LLC et al.,* No. 04-cv-00518 D.Md., is attached as Exhibit B.

CAFDC:  04-md-15863-03

under management.  Officer Defendants Mark Whiston, Robin Beery and Lars O. Soderberg (*see* below) are or were at relevant times, the executive officers of JCM.

(iii)    *Defendant Enhanced Investment Technologies LLC.*, (*"INTECH"*) is a Sub-Adviser, contracting with JCM and serving as adviser for Janus Adviser Risk Managed Large Cap Core Fund, Janus Risk-Managed Stock Fund and Risk-Managed Large Cap Growth Portfolio.  JCM has a majority ownership stake in INTECH.

(iv)    *Defendant Bay Island Financial LLP* ("Bay Island") is a Sub-Adviser, contracting with JCM and serving as adviser for Janus Adviser Small Cap Value Fund and Janus Small Cap Value Portfolio.  Bay Island is a wholly owned subsidiary of Janus.

(v)    *Defendant Perkins Wolf McDonnell & Company* ("Perkins") is a Sub-adviser, contracting with JCM and serving as adviser for Janus Adviser Mid Cap Value Fund, Janus Small Cap Value Fund and Janus Mid Cap Value Fund and Mid Cap Value Portfolio.  Perkins is a subsidiary of Janus.

(vi)    *Defendant Janus Distributors, LLC* distributes the Janus Funds and is the primary underwriter for the Funds.  Certain classes of shares in the Janus Funds pay fees to the Distributor, Janus Distributors, LLC.  The Class C Shares and Class I Shares of JAD, Service Shares and Service II Shares of JAS series of funds pay distribution and service related fees under plans adopted pursuant to Rule 12b-1.Such fees are intended to compensate the Distributor for services provided and expenses incurred by it in connection with the offering and sale of the shares of the Funds including the payment by the Distributor to dealers of commissions on the sales. (JIF funds do not pay distribution fees)

a.    JAS, one of the nominal defendants (*see* below), on behalf of the Service Class and Service II Class Shares of JAS, has adopted a distribution plan under

Rule 12b-1 under the Investment Company Act, which provides for a payment of a distribution fee of up to 0.75%, of the daily net assets of the Service Class and Service II Class Shares.

               b.       JAD, one of the nominal defendants (*see* below), on behalf of Class C Shares and Class I Shares of JAD, has adopted a distribution plan under Rule 12b-1 under the Investment Company Act, which provides for a payment of a distribution fee of up to 0.75%, of the daily net assets of Class C Shares and Class I Shares of JAD.

               (b)       The "**Janus Non-Party Participants**" are unnamed in consideration of a Tolling Agreement effective as of September 28, 2004 and are listed below:

### Officers

               (i)       *Mark B. Whiston* ("Whiston") is and/or has been Vice President and Chief Marketing Officer of Janus Capital Management; President and Director of Janus Foundation; Vice President and Director of Research of Janus Capital Management; Vice President and Chief Operating Officer of Janus Capital Management; President of Janus Services; Chief Executive Officer and President of Janus Capital Management; President of Janus Distributors; Co-Chief Executive Officer and President of Janus Capital International; President and Director of Janus International (Asia); President, Director and Chairman of Janus International; President of Janus Institutional Services; Director of Janus Capital Trust Management; Director of Janus World Funds; and Director of Janus World Principal Protected Funds. Whiston was also at all relevant times the CEO of Janus Capital Group ("JCG") and in that capacity was ultimately responsible for the actions of JCG until his resignation in April 2004.

(ii)  *Warren B. Lammert, III* ("Lammert") was at all relevant times a Vice President of Janus and the Executive Vice President and Portfolio Manager of Janus Mercury Fund.

(iii)  *Richard Garland* ("Garland") was the chief executive of Janus International and managing director of Janus Global Adviser before his resignation in November 2003, in connection with the market timing activities in the Janus Funds.

(iv)  *Lars O. Soderberg* ("Soderberg") was executive vice president of institutional services at Janus Capital Group, Inc. and a member of JCG's seven-member Management Committee.  He was placed on leave by Janus on April 6, 2004.  During 2003, Soderberg received commission payments of $1,792,518 for sales to institutional clients.

(v)  *Robin Beery* ("Beery") is a Senior Vice President and Chief Marketing Officer of JCG, and was at relevant times an executive officer of JCM.

(vi)  *Lance Newcomb* ("Newcomb") is, or was, an Assistant Vice President for Institutional Operations of JCG.

(vii)  *John Mari* ("Mari") is, or was, Vice President for Institutional Operations of JCG.

**Trustees**

(viii)  *Thomas H. Bailey* ("Bailey"), 67, was the founder of the Janus Funds in or around 1964.  He was formerly President and Chairman, CEO, Director and President of JCC and/or Janus Capital Group from 1978-2002 and 1994-2002, respectively.  He is Trustee of all three Trusts and has been Trustee of all Janus Funds since May 1993 or the fund's inception whichever came later.  Bailey was Chairman and President of JAS and;

President and Director of Janus Foundation from 1994-2002; and Director of Janus Distributors, Inc. from 1997-2001.  Bailey oversees over 60 Janus Funds.  He is an interested Trustee.

(ix)     *William F. McCalpin* ("McCalpin"), 47, has been a Trustee of JAS, JIF and JAD since June 2002.  McCalpin served on the Brokerage, Legal and Regulatory and Money Market Committees of Janus.  McCalpin oversees a total of 58 Janus funds.  He was appointed a Trustee in 2002.

(x)     *John W. McCarter, Jr.* ("McCarter"), 66, has been a Trustee of JAS, JIF and JAD since 2002 and has served on The Trusts' Audit Committees and Nominating and Governance Committees.  McCarter oversees a total of 59 Janus Funds.

(xi)     *Dennis B. Mullen* ("Mullen"), 61, has been a Trustee of all three Trusts since 1993 and has served on the Trusts' Audit Committees, Brokerage Committees, Nominating Committee and Governance Committees.  Mullen oversees a total of 64 Janus funds.

(xii)     *James T. Rothe* ("Rothe"), 61, has been a Trustee of all three Trusts and all Funds since January 1997 and has served on The Trusts' Brokerage Committees, Money Market Committees and Pricing Committees.  Rothe oversees a total of 58 Janus funds.

(xiii)     *William D. Stewart* ("Stewart"), 60, has been a Trustee of JIF, JAS and JAD since September 1993 and has served on the Trusts' Audit Committees, Legal and Regulatory Committees, Nominating and Governance Committees, Pricing Committee and Executive Committees.  Stewart oversees a total of 59 Janus funds.  In 2002, Stewart received $176,667 in total compensation from all Janus funds.

(xiv)     *Martin H. Waldinger* ("Waldinger"), 66, has been a Trustee of JIF, JAS and JAD since September 1993 and has served on the Trusts' Legal and Regulatory

Committees, Money Market Committees and Pricing Committees.  Waldinger oversees a total of 58 Janus funds.

(xv)    The Trustees compensation and the number of Funds in which each Trustee served is as follows:

| Name of Trustee | 2002 Total Cash Compensation Received from Fund Complex | Number of Funds |
|---|---|---|
| William F. McCalpin | $108,334* | 58 |
| John W. McCarter, Jr. | $ 94,334* | 58 |
| Dennis B. Mullen | $183,667 | 58 |
| James T. Rothe | $176,667 | 58 |
| William D. Stewart | $176,667 | 58 |
| Martin H. Waldinger | $176,667 | 58 |

*  Messrs. McCalpin and McCarter were not appointed trustees until June 2002 and, thus, did not begin receiving compensation until midway through 2002.

The foregoing cash compensation is greater than the collective investment these individuals have in the Fund.  In fact, Messrs. McCalpin, McCarter, Rothe, Stewart and Waldinger had no investment in the Fund at December 31, 2002.  Additionally, the Trustees serve on the boards of *virtually all of the* Funds of the Trusts, and are paid for this service, both with directors'/trustees' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of management of the Trusts or the Adviser when the interests of such management may conflict with the interests of the Plaintiffs.

22.    The Structure of the Janus Funds is as follows:  The Janus mutual funds are a series of five trusts, three of which are the subject of this litigation.[4]  The Funds are structured as described below:

---

[4]    Janus offers four domestic mutual fund families, Janus Investment Fund ("JIF"), Janus Aspen Series ("JAS"), Janus Adviser Series ("JAD") and Janus Adviser.  Janus Adviser was not offered until October 2003.  Janus International is the fifth Janus fund family and is available only to investors outside the United States.  Janus Adviser and its Funds and Janus International and its Funds are not included in this litigation.

CAFDC:  04-md-15863-03

     (g)    <u>The Parent Company</u>

     (i)    Janus Capital Group, Inc. ("JCG" or "Janus") is the parent of the Adviser to the three Janus fund families relevant to this action  Janus sponsors, markets and provides investment advisory, distribution and administrative services to mutual funds in both domestic and international markets.  As of May 31, 2003, Janus, through its subsidiaries managed $147.4 billion in assets across multiple investment disciplines. Janus offers three distinct domestic mutual fund families relevant to this case.  These fund families are organized as business trusts or in an umbrella corporation:  Janus Investment Fund ("JIF"), Janus Adviser Series ("JAD"), and Janus Aspen Series ("JAS") (hereafter together the "Trusts" or the  "Fund Families").

     (h)    <u>The Trusts</u>

     (i)    Janus Investment Fund ("JIF"), a Massachusetts corporation with its principal place of business in Denver, Colorado, is registered under the Investment Company Act as a no-load, open-end management investment company. JIF serves direct and retail "supermarket" investors.

     (ii)    Janus Aspen Series ("JAS") was organized as a Delaware Statutory Trust in May 1993 and is registered under the Investment Company Act of 1940 as an open end management investment company.  JAS offers seventeen "series" of funds, fifteen of which are equity funds.

     (iii)    Janus Adviser Series ("JAD") was organized as a Delaware Statutory Trust in March 2000 and is registered under the Investment Company Act of 1940 as an open-end management investment company.  JAD offers fifteen funds, thirteen of which are equity funds.

(i)    The Boards of Trustees

(i)    Each Trust or corporation[5] is governed by a Board of Trustees which is responsible for the management of the trust.  The Trustees have ultimate responsibility for all major decisions concerning the investment objectives and policies for each fund.

(ii)    The Trustees are responsible for major decisions relating to each Fund's objectives, policies and techniques; the Trustees also supervise the operation of the Funds by their officers and review the investment decisions of the officers although the Trustees do not actively participate on a regular basis in making investment decisions.

(iii)    The Trustees hold legal title to the assets of the Janus Funds and are responsible for assuring that the funds are managed in the best interest of shareholders.  The Trustees contracted with Defendant JCM to serve as the Funds' Adviser.

(iv)    Each Trust's Board has five standing committees that each performs specialized functions: the Audit Committee; Brokerage Committee; Money Market Committee; Nominating and Governance Committee; and the Pricing Committee.

(v)    The Trustees of each Trust are elected, but serve *indefinitely* from date of appointment until termination of the Trust or until the death, retirement or disability or removal of the trustee.  The mandatory retirement age of a trustee is 72.  There are 58 Funds in the three Trusts in the aggregate.

(vi)    Trustees may be removed with or without cause at any time either upon the unanimous written request of the remaining Trustees or at any meeting of the shareholders by a vote of at least two-thirds of the Outstanding Shares.  Whenever a vacancy

---

[5]    There is no difference in the duties for the Board for the Trustees of a Trust or the Corporation (hereafter together "Board" or "Board of Trustees").

CAFDC:  04-md-15863-03

exists the remaining Trustees appoint any person as they determine *in their sole discretion* to fill that vacancy consistent with the limitations under the 1940 Act.

(vii)    Each of the Janus Defendants and the Trustees owed to the Janus Funds and their shareholders the fiduciary duties of loyalty, candor and fair dealing.

(viii)    The acts and conduct of the Janus Defendants alleged in this Complaint constitute willful misfeasance, bad faith or gross negligence and reckless disregard to their duties to the Funds.

(j)    The Investment Adviser

(i)    Janus Capital Management, LLC ("JCM" or the "Adviser") contracts with the Trustees for the Trusts to make investment decisions and to advise and manage the Janus Funds. Subject to the supervision of the Trustees, the Adviser provides an investment program for each Fund, consistent with its Prospectus, and makes decisions about when to purchase or sell securities on behalf of each Fund. The Adviser may contract with a sub-adviser to assist in performing its duties. JCM has served as adviser for all the Janus Funds since April 2002. Janus Capital Corp. served as Adviser to the Janus Funds until April 2002 when it formed JCM as a wholly owned subsidiary, and JCM took over all the duties to the Funds under the Advisory Agreements.

(k)    The Sub-Advisers

(i)    Enhanced Investment Technologies LLC., ("INTECH") is a Sub Advisor, contracting with JCM and serving as adviser for Janus Adviser Risk Managed Large Cap Core Fund (a JAD fund), Janus Risk-Managed Stock Fund (a JIF fund) and Risk-Managed Large Cap Growth Portfolio (a JAS fund). JCM has a majority ownership stake in INTECH.

(ii)    Bay Island Financial LLP ("Bay Island") is a Sub-Adviser, contracting with JCM and serving as adviser for Janus Adviser Small Cap Value Fund (a JAD fund) and Janus Small Cap Value Portfolio (a JAS fund).  Bay Island is a wholly owned subsidiary of Janus.

(iii)    Perkins Wolf McDonnell & Company ("Perkins") is a sub-adviser, contracting with JCM and serving as adviser for Janus Adviser Mid Cap Value Fund  (a JAD fund), Janus Small Cap Value Fund and Janus Mid Cap Value Fund (JIF funds) and Mid Cap Value Portfolio (a JAS fund). Perkins is a subsidiary of Janus.

(l)    The Distributor

Janus Distributors, LLC (the "Distributor") has contracted with the Trusts to act as agent for promoting the sale and distribution of shares of each of the Janus Funds.  The Distributor is a Broker-Dealer registered with the Securities Exchange Commission ("SEC") and is a member of the National Association of Securities Dealers, Inc. ("NASD") and is the Funds primary underwriter.

23.    Paragraphs 24 through 30 intentionally left blank.

31.    **"Additional Defendants"** are as follows:

(a)    *Defendant Aurum Capital Management Corp.* ("Aurum Capital"), a California corporation, is a registered investment advisory firm headquartered at 84 West Santa Clara Street, Suite 690, San Jose, California.  Aurum Capital is an affiliate of Aurum.  Aurum Capital was an active participant in the unlawful scheme alleged herein.

(b)    *Defendant Aurum Securities Corp.* ("Aurum"), a California corporation, is a registered investment advisor and Broker-Dealer, with offices at 120 Montgomery Street, San Francisco, California.  Aurum was an active participant in the unlawful scheme alleged herein.

(c) *Defendant Golden Gate Financial Group, LLC* ("Golden Gate"), a Delaware limited liability company, is a registered investment advisor and Broker-Dealer founded in May 2002. It is located at 900 North Point, Suite D-405, San Francisco, California. Its principals have been providing investment management services to high net worth individuals and institutions since 1991. Two of the principals formerly were executives of Aurum and Aurum Capital. Because Aurum, Aurum Capital and Golden Gate are affiliated and collectively participated in the late trading and timing scheme alleged here, they collectively will be referred to as the "Aurum Defendants."  Golden Gate was an active participant in the unlawful scheme alleged herein.

(d) *Defendant Bank of America Corp.* ("BOA") is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[6]  BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products.  BOA is the indirect parent of Banc of America Securities LLC.

(e) *Defendant Banc of America Securities LLC* ("BAS"), a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is wholly owned by BOA. BAS, a registered Broker-Dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina.  BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940.  In its

---

[6]    Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

CAFDC:  04-md-15863-03

capacity as Broker-Dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

(f)     *Defendant CIBC Securities, Inc.* ("CIBC") is a Canadian Broker-Dealer headquartered at 800 Bay Street, Toronto, Canada.  During the relevant period, CIBC lent money to Canary to finance timing trades and provided a clearing platform to execute timing trades in a number of mutual funds.

(g)     *Defendant CIBC World Markets* ("CIBC World") World, is a Canadian investment bank located at 161 Bay Street, BCE Place, Toronto, Canada.  CIBC and CIBC World are collectively referred to as the "CIBC Defendants."

(h)     *Defendant Canary Capital Partners, LLC* ("Canary"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds.  Canary Capital Partners, Ltd. ("CCP Ltd."), is a Bermuda limited liability company.  At all relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds.  Canary Investment Management, LLC ("CIM"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, CIM managed the assets of CCP and CCP Ltd. in exchange for a fee equal to 1.5 percent of the assets of Canary plus 25 percent of the profits above a certain threshold.  As of July 2003, Canary Asset Management had received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

(i)     Canary, CCP Ltd., CIM, and Stern are collectively referred to herein sometimes as "Canary."  In September 2003, Canary reached a settlement of charges filed

against it by the Attorney General of the State of New York.  No claims are asserted against Canary herein.

(j)    *Defendant Edward J. Stern* ("Stern") is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM. Noah Lerner ("Lerner") was at all relevant times an employee of Canary.  Andrew Goodwin ("Goodwin") was at all relevant times up to 2001 an employee of Canary.

(k)    *Defendant Haidar Capital Management LLC ("Haidar")* is a registered Broker-Dealer , located at 415 Madison Avenue, 24th Floor, New York, New York 10017.

(l)    *Defendant Pritchard Capital Partners LLC ("Pritchard")*, a Louisiana limited liability company, is a registered investment advisor and Broker-Dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana.  Pritchard was an active participant in the unlawful scheme alleged herein.

(m)    *Defendant Smith Barney Citigroup (formerly Solomon Smith Barney) ("Smith Barney")* is a registered Broker-Dealer and a division of CitiGroup Global Markets, Inc., a New York corporation located at 388 Greenwich Street, New York, New York 10013.

(n)    *Defendant Trautman Wasserman & Company, Inc. ("Trautman")*, a Delaware corporation, is a registered investment advisor and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.  Trautman was an active participant in the unlawful scheme alleged herein.  Trautman was the most active timer in the Janus Funds

(o)    *Defendant Wall Street Global, LLC ("WSG")* is a registered Broker-Dealer with its headquarters at 25 Broad Street, 20th Floor, New York, NY  10004.

(p)    Defendants Aurum, Haidar, Smith Barney, Pritchard, Trautman and WSG may be collectively referred to in this Complaint as the "**Timer Defendants**."

CAFDC:  04-md-15863-03

32.    The "**Nominal Defendants**" are the three Janus Trusts, JIF, JAD and JAS.  The Janus Funds they hold are listed on Exhibit A attached.

## IV.    STATEMENT OF FACTS

### A.    General Factual Background

#### (1)    Introduction

33.    Mutual funds enable small investors to invest long-term capital in the stock and bond markets.  Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with smaller amounts of capital than otherwise would be required for such investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services of professional investment advisers whose services otherwise would not be available at affordable prices.

34.    Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.  Mutual fund shares are issued pursuant to prospectuses that must comply with the Securities Act of 1933 and the Investment Company Act.  The investor's cash is then used by the mutual fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.    Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.    Mutual funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds [and creating new funds in the series].

37.    Whether corporation or trust, typically all of the trustees are the same individuals and have the same responsibilities, the only difference between trustees being the form of entity they serve.  Trustees have ultimate responsibility for the funds.

38.    Each of the funds is created and sponsored by the Adviser and is managed under the supervision of seven of trustees.  The same trustees have supervised all the funds at all times relevant hereto, and their meetings for all the Funds occur at or about the same time.  Each of the funds has the same adviser, who in turn appoints the same trustees, the same distributor, the same custodian, and the same transfer agent for all the funds, all of whom serve indefinite terms.  The agreements between the funds and each of these entities are substantially identical form agreements, with only minor differences only in fee percentages.  In many instances, the funds share costs among themselves.  In substance, all the funds are operated as a single *de facto* entity.  Plaintiffs therefore bring this action as a derivative action on behalf of the entire Janus family of funds, as well as on behalf of the particular Funds in which they invested.

39.    The trust or corporation contracts with an adviser or manager to handle the day-to-day operations of the fund including making investment decisions, although the trustees retain ultimate responsibility for the fund.  The adviser or the trust will enter into contracts with other entities, which in almost all instances are affiliates of the adviser, for investment advisory servicing (adviser, sub-adviser), selling or underwriting (distributors), shareholder relations and other back-office services (administrator).  Each of these affiliates typically will be paid a percentage of the adviser's fee, a percentage of the assets under management, or a transaction fee from the Net Asset Value of the fund.

40.    Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of

assets under management.  Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

### (2)    NAV Pricing

41.    Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

42.    Because NAV is set just once at 4:00 p.m. every day under the forward pricing rule, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.    Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and

redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

### (3)    Market Timing Transactions

44.    Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds – where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets – the duration of the round trip will be slightly longer.

45.    Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.    Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.    Many market timers purchase mutual funds when trading models analyzing performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the

trader acquires small cap mutual fund shares in order to capture the benefit of the price rise. The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48. By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, which costs are borne by the fund itself.

49. Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50. One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices. A typical example is a U.S. mutual fund that invests in Japanese securities. Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time. When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low. A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51. Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day. By the time a trader can buy the securities, the market price has risen to

reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

53.     Yet another market timing scheme is "liquidity arbitrage."  Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies.  The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

**(4)     Late Trading**

54.     Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading."  Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to

purchase or redeem mutual fund shares *after* 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.    Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively.  "Late trading can be analogized to betting today on yesterday's horse races."[7]  The manipulative device virtually eliminates investment risk.

56.    The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems.  When the late trader redeems his shares and claims his profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash that belong to the fund and its shareholders and would otherwise remain invested – to give the late trader his gain.  The late trader's profit is revenue withheld from the mutual fund.  The forward pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R. §270.22c-1(a).

57.    Late trading can be accomplished in at least two different ways.  The first way market timers are able to trade late is by making arrangements with a mutual fund adviser or a third-party intermediary who has made arrangements with a mutual fund adviser to have access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS provided trading terminals to at least three Broker-Dealers that engaged in market timing and Canary– in effect, making them branch offices of BAS, but unencumbered by BAS's obligation to adhere to the forward pricing rule – giving them the ability to place orders for mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York each day.

---

[7]    *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

CAFDC:  04-md-15863-03

58.    Market timers are also able to trade late by making arrangements with intermediaries, such as Broker-Dealers, trust companies, and other clearing agents, to combine the market timers' trades with other mutual fund purchases or redemptions each day, which are processed as batch orders.  These intermediaries net purchases against redemptions, and submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.    Although orders must be submitted to the intermediary Broker-Dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.    Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents.  These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m.  Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m. Finally, some late traders were given trading platforms, integrated hardware-software systems that allowed them to trade mutual fund shares directly without using an intermediary to submit

orders to FundSERV.  In some cases fund managers themselves permitted and aided late trading by fund investors.

61.    Late traders were not necessarily restricted to trading in any single fund family through these schemes. Often intermediary Broker-Dealers sell shares of many different fund families through "Supermarkets."  It is not unusual for a single Supermarket to offer thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with Broker-Dealers who operate a fund Supermarket.

62.    Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

### (5)    Mutual Fund "Short Selling" Strategy

63.    A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio.  Using this technique timers were able to profit in both rising and falling markets. Generally, fund managers do not disclose the portfolio holding information of the funds they manage.  Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available.  In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar. However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell

short[8] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit.  By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timers in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

### (6)   Market Timing Is Easy to Detect and Has Been Well-Known Since 1997

64.   Market timing in mutual funds has occurred at least since the late 1980s.  During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the Putnam International Equities Fund No Action Letter, Fed. Sec. L. Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

65.   Prior to September 3, 2003, market timing and late trading had become common practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

---

[8]   Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

CAFDC:  04-md-15863-03

66.    In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

67.    Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance.  Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.    Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer.  The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.  These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.    However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

CAFDC:  04-md-15863-03

70.    Market timing is easy to detect through shareholder turnover data.  A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.  Because timers make frequent "round trips," when a timer is active in the fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.    A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

72.    Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.    By 1997, market timing in mutual funds was well-known and well-documented.  During October, 1997, Asian markets were experiencing severe volatility.  On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market.  Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternate method to calculate NAV.  Some

investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.    On November 5, 1997 the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil.  *See Mutual Funds Fight the 'Market Timers,'* Wall St. J., 11/5/97, C1.  For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.    The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.  Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."  *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI Securities Law Procedures Conference (Dec. 4, 1997).

76.    By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors.  *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

77.    One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers.  *See* Eric Zitzewitz, *Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds*, Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.

78.    By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.  One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S."  *See* http://www.itginc.com/research/fvm.html.

### (7)    Market Timing Arrangements

79.    Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.  The authority to time mutual funds is known as "capacity."  Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.    Timers, the intermediaries, and the Funds' managers and advisers entered into *specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades.  Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.    Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as

from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

82.    Market timers frequently offered mutual advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time.  In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

83.    As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003 before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Government Affairs:[9]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders:** 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing - *i.e.*, these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies, and in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations.  We are aggressively following up on these arrangements.

> **Quid pro quo arrangements:** Although the information provided in this area is limited, it appears that many of the person proposing a special arrangements to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex.  In most of the situations where sticky assts were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

84.    Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through Broker-Dealers or other timers.  Many fund

---

[9]    Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs, 108th Cong. (Nov. 3,2003) (testimony of Stephen M. Cutler, Director, Division of Enforcement, U.S. Securities & Exchange Commission).  Mr. Cutler offered the same testimony on Nov. 4, 2003, before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services.

CAFDC:  04-md-15863-03

families had "Anchor Brokers" or "Anchor Timers," who were designated Broker-Dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.    Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the other financial institutions as well as the market timers.

86.    Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing consisted of loans for market timing and late trading, and swaps for shorting.  The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit.

87.    Broker-dealers and other intermediaries who offered timing capacity received remuneration from both the mutual funds themselves and the market timers to whom they allocated capacity.

88.    Distributors and other service agents who permitted timing also benefited by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.  Distributors often receive fees based on assets under management and may earn commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for

marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.

89.    Intermediaries who facilitated market timing also received "wrap fees" from market timers.  Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager.  Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis.  The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee – usually from 1 to 3 percent of assets.  Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.    Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser.  Distributors usually pay a portion of those 12b-1 Fees to the Broker-Dealers who sell fund shares.  The Broker-Dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds.  However, Broker-Dealers who offered timing capacity often received 12b-1 Fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

91.    Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes.  For example, market timers frequently traded through third parties, *i.e.*, Broker-Dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to

mutual fund companies *en masse*. By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts. This is one example of market timing "under the radar."

92.    Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.   Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors were exempt from the restrictions.

93.    Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.  These tactics included: (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated Broker-Dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.  Some market timers employed these tactics directly, without relying on an intermediary broker.

## **Banc of America Securities LLC**

94.    Some time prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and Broker-Dealers who acted as intermediaries for a large number of market timers.

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and Broker-Dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.     The box allowed Broker-Dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.     In addition, Broker-Dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

99.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and defendant Aurum, a Broker-Dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.    BAS installed the box in the offices of three Broker-Dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave the box to defendant Aurum in around late 1999 or early 2000, to defendant Trautman in or about early

2001, and to defendant Pritchard in early 2003.  Each of these Broker-Dealers was charged $10 for each trade that was entered through the box.

101.    BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the Broker-Dealers.

102.    BAS also installed the box in Canary's offices in or around the summer 2001, but did not charge any fee to Canary for orders placed through the box.  Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a Broker-Dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.    On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies.  The SEC charged Siphol[10] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

> *"Manual" Late Trading at BAS*
>
> 15.    In or around May 2001, Canary began to late trade the Nations Funds.  At first, Canary conducted its late trading "manually."  In the manual stage, Canary was able to engage in late trading primarily because Sihpol and his team falsified

---

[10]    Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

BAS' books and records.  Prior to 4:00 p.m. ET, a Canary trader would send Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile.  Upon receipt, Sihpol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening.  Thus, Sihpol created false order tickets that made it appear as if the orders had been received prior to 4:00 p.m. ET.

16.    Sometime after 4:00 p.m. ET, a Canary trader would telephone Sihpol or a member of his team, and would either confirm or cancel the "proposed" trades.  If confirmed, Sihpol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing.  As a result, Canary would receive that day's NAV.  If Canary cancelled the "order," Sihpol or a member of his team would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.    In the summer of 2001, BAS technicians installed the direct access system in Canary's offices.  Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.    After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered.  The trader then faxed the document to Sihpol or a member of his team.  The following day, Sihpol or a member of his team would use this document to reconcile Canary's trades.  Once the trades were reconciled, Sihpol or a member of his team discarded the document.

19.    From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade.  Canary also late traded "manually" whenever there were technical problems with the electronic system.  BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.    The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.  By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.    Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link.  Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

CAFDC:  04-md-15863-03

104.    By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices.  In addition, the Corporation announced that it will provide restitution for shareholders of ***third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation*** in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

105.    On March 15, 2004, the SEC and the New York Attorney General ("NYAG") announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing.  BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

106.    The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed as a result of market timing in Nations Funds and ***other mutual funds through Bank of America***." (Emphasis added).  In the same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading.  Bank of America not only permitted timing in its own funds, ***it provided the instruments for timing and late trading of numerous other funds through its Broker-Dealer.  This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again***.

107.    BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to Nations Funds shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades.  Thus, *BOA itself attributed $350 million of its $375 million*

*monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families.*

108.    In further recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

109.    Between late 1999 through 2003, BAS, either manually or by providing the box, allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

110.    Banc of America played a significant role in market timing the Janus funds, serving as the clearing bank for most of the Trautman timing trades and others.  E-mails confirm that Banc of America's cleared Trautman trades of $56 million on June 28, 2002 and $50 million on October 29, 2002. The Janus Defendants were well aware of BOA's participation in the timing scheme. A November 5, 2002 e-mail Jeb Avery to  Leuthold explained "only approved timers are coming in through Banc of America (Trautman)."

### Aurum Defendants, Trautman, and Pritchard

111.    Aurum, Trautman, and Pritchard were Broker-Dealers or market timers who entered into express agreements with BAS enabling them to time and late trade mutual funds through the BAS box.  These defendants timed and late traded mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

(a)    Defendant Aurum, an Introducing Broker, timed and late traded the Janus Funds through the Bank of America RJE system for its clients.

(b)    Aurum timed and traded at least the following Janus Funds through BAS: Janus Enterprise, Janus Core Equity and Janus Mercury.

(c)    Defendant Trautman market timed and late traded the Janus Funds through the Bank of America RJE system for its clients.

(d)    Defendant Trautman timed and late traded at least the following Janus Funds through BAS:  Janus Mercury, Janus worldwide, Janus Adviser International, Janus Global Value, Janus Adviser Worldwide, Janus Enterprise, Janus Adviser Cap. App., Janus Risk Managed stock Fund, Janus World Global Technology A, Janus world Global Life Science A, Janus World Twenty A, Janus World All Cap Growth, Janus World Short Term Bond, Janus World Core Equity, Janus World Strategic Value, Janus World US Dollar Res. A2 and Janus Worldwide.

(e)    Defendant Pritchard, an Introducing Broker, market timed and late traded the Janus Funds through the Bank of America RJE system for its clients.

(f)    Pritchard timed and late traded at least the following Janus Funds through BAS: Janus Adviser International, Janus Adviser Flexible Income, Janus Adviser Worldwide, Janus Enterprise and Janus Global Value.

(g)    Aurum's Trautman's and Pritchard's trades in the Janus Funds are summarized in the following tables:

**Aurum Trades (Aggregate) in the Janus Funds**

| Fund | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|------|------|------|------|------|
| Enterprise | 39,753 | 2,623,733 | 2,706,775 | 83,042 |
| Core Equity | 168,673 | 3,899,772 | 3,915,482 | 16,370 |
| Mercury | 87,779 | 3,313,090 | 3,324,364 | 11,274 |
| **TOTAL** | 296,205 | 9,835,935 | 9,946,620 | 110,686 |

**Pritchard's Trades (Aggregate) in the Janus Funds**

| Fund | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|------|------|------|------|------|
| Adviser International | 915,273 | 17,262,077 | 17,358,106 | 96,029 |
| Adviser Flexible Income | 245,549 | 3,041,732 | 3,040,924 | (808) |
| Adviser Worldwide | 58,001 | 1,204,237 | 1,199,616 | (4,621) |
| Enterprise | 22,074 | 700,056 | 695,407 | (4,649) |
| Global Value | 67,474 | 587,755 | 571,495 | (16,260) |
| **TOTAL** | 1,308,370 | 22,795,857 | 22,865,547 | 69,690 |

**Trautman's Trades (Aggregate) for its own Account in the Janus Funds**

| Fund | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|------|------|------|------|------|
| Mercury | 254,584 | 3,870,206 | 3,890,613 | 20,407 |
| Adviser International | 11 | 225 | 212 | (13) |
| **TOTAL** | 254,595 | 3,870,431 | 3,890,825 | 20,394 |

CAFDC:  04-md-15863-03

**Trautman's Trades (Aggregate) on behalf of Canary in the Janus Funds**

| Fund | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Mercury | 27,578,724 | 423,993,901 | 426,321,068 | 2,327,167 |
| Worldwide | 2,573,301 | 85,667,000 | 70,000,000 | 701,487 |
| Adviser International | 932,986 | 16,409,000 | 16,811,574 | 402,574 |
| Global Value | 534,121 | 5,060,397 | 5,153,378 | 92,981 |
| Adviser Worldwide | 6,538,533 | 143,545,841 | 143,545,056 | (785) |
| Enterprise | 468,637 | 12,999,996 | 12,873,466 | (126,530) |
| **TOTAL** | 38,626,302 | 687,676,135 | 674,704,542 | 3,396,894 |

**All Trautman's Trades (Aggregate) in the Janus Funds**

| Fund | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Mercury | 35,050,088 | 555,457,598 | 562,046,306 | 6,588,708 |
| Adviser Worldwide | 26,531,573 | 599,159,793 | 604,421,639 | 5,261,846 |
| Adviser International | 24,944,516 | 505,189,630 | 507,477,340 | 2,287,710 |
| Enterprise | 6,188,683 | 146,325,781 | 147,622,701 | 1,296,919 |
| Adviser Cap App | 1,102,344 | 20,880,088 | 21,691,346 | 811,258 |
| Risk Managed Stock Fund | 278,293 | 3,000,000 | 3,317,254 | 317,254 |
| World Global Technology A | 3,145,035 | 6,918,415 | 7,142,579 | 224,165 |
| World Global Life Science A | 2,002,596 | 12,799,684 | 12,927,047 | 127,363 |
| World Twenty A | 877,247 | 6,159,137 | 6,208,321 | 49,183 |
| World All Cap Growth | 838,879 | 5,962,757 | 6,009,795 | 47,038 |
| World Short Term Bond | 417,785 | 4,980,000 | 5,011,258 | 31,258 |
| World Core Equity | 115,652 | 975,000 | 995,041 | 20,041 |
| World Strategic Value | 161,749 | 1,122,081 | 1,129,578 | 7,497 |
| World US Dollar Res A2 | 347,669 | 36,686,361 | 36,669,925 | (16,437) |
| Worldwide | 261,097 | 8,000,000 | 7,720,804 | (279,196) |
| **TOTAL** | 102,263,237 | 1,913,616,326 | 1,930,390,934 | 16,774,608 |

## Canary

112.    In or about summer 2001, as part of a package deal with BAS that included late trading and timing capacity in the Nations funds, financing for late trading and timing trades in Nations funds and other mutual funds, and unlimited capacity to late trade and time hundreds of other mutual funds, defendant BAS installed the "box," free of charge, at Canary's offices in Secaucus, New Jersey.  The deal is memorialized in a letter dated May 1, 2001 by Stern to Siphol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a time of day that is a little bit earlier than Matt [Augliero, a mutual fund clearing specialist at BAS] specified in our first meeting.  As soon as we can work out our lending arrangement with the bank and begin transacting electronically via ADP [i.e., the box], we will draw down leverage against the capital we have deployed in the Nations funds, effectively increasing our trading capital with your firm to $32 million. If all goes well, this capital should grow larger as we get a sense of what trades can and cannot be done via the Banc of America Securities Platform.  We really would like to get going with ADP and begin trading electronically as soon as possible.

113.    Numerous other third parties also participated in the scheme and profited from timing at the expense of the Janus Funds and the Plaintiffs.

(a)    The Janus Defendants admitted in the SEC settlement that Janus had timing agreements with twelve outside parties.  E-mails reviewed buy Plaintiffs' counsel indicate that there may have been even more, and that even where no agreements were in place the Janus Defendants knew of timing activity by others.  These third parties included Defendant Smith Barney, Defendant WSG and Defendant Haidar.

114.    The CIBC Defendants lent money to Canary and other timers to facilitate the timing of the Janus Funds.  These lending agreements, which often included pledging securities listed in stock swaps or close monitoring of the timing trades demonstrate that the CIBC Defendants knew that the loan proceeds were being used for timing.  As a sophisticated lending

institution, CIBC knew, recklessly disregarded that these activities were illegal, in violation of the Janus Funds' policies and harmful to the Funds.

115.    Paragraphs 116-250 were left blank intentionally.

### (8)    Impact of Market Timing

251.    Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments.  Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts.  Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.    Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways.  The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.    Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the Funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.    Dead Weight includes, but is not limited to, the following:

(a)    increased service agent fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)    statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

CAFDC:  04-md-15863-03

(c)    higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

(d)    lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)    inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (*e.g.*, buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)    transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)    interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)    increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio

managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.    Dead Weight harms not only the funds that are timed, but can also harm non-timed funds.   Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.  Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.  Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.  This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.  If fees are calculated on a transactional basis, the costs are increased directly.  If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions.  Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.    Non-timed funds were also harmed by increased expense ratios resulting from market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal.  Fixed costs, such as director's fees, are shared among funds and are accrued daily. When large numbers of investors redeemed their shares after discovering that the funds were

implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.    Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.    In addition to exposing mutual funds to Dead Weight, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets.  When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises.  The timer therefore pays less than the true value of the fund share.  When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation."  The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.  Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund.  When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV. However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation

between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased.  Since the timer's money is either invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

### B.    The Janus Fund Families

#### (1)    The Janus Defendants' Knowledge and Participation in the Market Timing Scheme

264.    The facts presently available to Plaintiffs establish that the following Janus Funds were timed:  Janus Adviser Capital Appreciation Fund, Janus Adviser Flexible Income Fund, Janus Adviser International Growth Fund, Janus Adviser Worldwide Fund, Janus Core Equity

Fund, Janus Enterprise Fund, Janus Global Opportunities Fund, Janus Global Value Fund, Janus High Yield Fund, Janus Mercury Fund, Janus Overseas Fund, Janus Risk Managed Stock Fund, Janus World All Cap Growth Fund, Janus World Core Equity Fund, Janus World Global Technology Fund, Janus World Global Life Sciences Fund, Janus World Short Term Bond Fund, Janus World Strategic Value Fund, Janus World Twenty Fund, Janus World US Dollar Reserves and Janus Worldwide Fund.  On information and belief, after discovery, Plaintiffs believe the evidence will show that other Janus Funds were also timed.

265.    Throughout the relevant time period, the Janus Defendants at the highest levels were well aware that the various Janus Funds were being timed, and that timing was harmful to the Janus Funds and their shareholders.  Specifically, Whiston, CEO of Janus Capital Group, Lammert, Executive Vice President of Janus Capital Group, Garland, CEO of Janus International, Soderberg, Executive Vice President of Institutional services for Janus Capital Group and Trustee Defendant Thomas Bailey, founder and former CEO of Janus were all active participants in market timing, or at a minimum were fully informed of its existence and negative impact on the Janus Funds and their shareholders.  On information and belief, other Janus Defendants were also active participants in the timing schemes or at a minimum were fully informed about them.

266.    Despite this knowledge, the Janus Defendants (and non-party participants) did not act to put a stop to timing, but on the contrary, allowed and encouraged timing by certain favored investors when doing so benefited the Janus Defendants at the expense of the Janus Funds and their shareholders.  The involvement and knowledge of the Janus Defendants in market timing and its detriment to the Funds is evidenced by their e-mail correspondence with frustrated Janus Portfolio Managers and other Janus employees.

267.   On November 9, 1999 Sandy Rufenacht, ("Rufenacht") Portfolio Manager of the Janus High Yield Fund, wrote to John Murray, at that time Janus Director of Institutional Operations, as well as to George Hagerman ("Hagerman"), a Janus salesman and numerous other Janus employees asking that the Janus High Yield Fund be pulled from all "supermarket" platforms.  Noting that the fund was the only no-load high yield fund without a redemption fee, Rufenacht argued that it was in the best interest of the fund's shareholders to take this action. Rufenacht stated that the only reason why the High Yield Fund did not rank as high in performance as the other high yield managed funds at Janus was because this Fund had to manage around large inflows and outflows which affect the yield of the Fund as well. (Rufenacht, however, later OK'd numerous timing deals in his own funds).

268.   On September 12, 2002, Jason Yee, Portfolio Manager of the Janus Global Value Fund, e-mailed Whiston and Mari, informing them that market timers and daily flows of 8%-12% of the entire fund were making it impossible to manage Global Value prudently.  Yee stated that market timing had moved from being a small nuisance to a "significant problem" and urged the institution of a backend load or some sort of short-term trading fee to address the issue.

269.   On September 26, 2002, Yee again e-mailed Mari and Whiston and others decrying the negative impact market timing had on his funds. Yee stated that the market timers were "essentially stealing" returns from the Global Value Fund's stable shareholder base, as well as causing much unnecessary trading in the portfolio. In Yee's opinion putting an end to this market timing activity completely was in the best interest of the Fund.  Yee explained that large market timing inflows put him as a portfolio manager in the difficult position of not being able to invest the new money, with the net result that he became fully invested/overdrawn in the downturns and underinvested in the rallies, which is a significant detriment to the fund's long-

term shareholders, as well as being a huge administrative and portfolio headache. Yee informed Whiston, Mari and others that there were too many people interested in renting short-term performance and taking advantage of the system, and that these were not the kinds of shareholders the Janus Funds needed or should encourage.

270.    Mari responded the following day assuring that Yee that Janus was doing everything in its power to remedy the issue.  Significantly while Mari acknowledged that Janus had the power to implement a redemption fee, he characterized this as only a "last resort", and without giving any indication that such action would be taken.

271.    On December 3, 2002, Yee sounded the alarm again, this time as Portfolio Manager of the Janus International Value Fund, by e-mailing Whiston, Mari, Beery and Helen Hays, Portfolio Manager of another Janus Fund, stating that within the span of a week, he had inflows and outflows greater than 60% of the entire fund.  Knowing that these assets would quickly leave, he was unable to invest them and was accordingly mostly in cash during an otherwise great week of performance.  Yee estimated that the timers "STOLE" about 120 basis points of performance from that fund over that one week period, a significant handicap to overcome.

272.    In an e-mail dated November 13, 2002 from Janus employee Russ Shipman to Beery, Shipman urged Beery to "squash" market timers "like bugs."  Shipman warned that the "free performance" realized by market timers would also damage the long-term investors and was a "wickedly selfish mix" - one that could be weaved into a class action lawsuit against both the Trustees and the Fund complex.  Citing the Funds' fiduciary duties to all investors, Shipman predicted that "the regulatory folks, judges and juries," would likely stand behind "the widows and orphans who are in fact long-term investors."

273.    Other e-mail communications also confirm the active involvement of the Janus Defendants in the wrongdoing alleged.

274.    On November 29, 2001, James A. Wilson, Jr. ("Wilson") employee of Defendant Trautman, contacted Lammert, to advise him of a Trautman client that planned to put another $10-$20 million into the Janus Mercury Fund, when the next signal flashes, which he hoped would be soon.  Wilson also asked Lammert how he felt about it, and asked for any information Janus could provide on its "top holdings and sectors, etc." to use for anticipating the risk, "which would justify giving us (you and) more money and more money is always good."  Rather than rejecting the offer, Lammert forwarded the request to a Dave Agostine of Janus, instructing Agostine to provide Trautman with whatever information Janus offers its institutional clients about its holdings, directions, etc.

275.    By an e-mail dated early November, 2001, James Nesfield of Nesfield Securities notified Canary that he had contacted Bailey regarding timing capacity in Janus.  Nesfield later agreed to set up a phone or in person meeting between Stern of Canary and Defendant Bailey.

276.    In early August, 2002 e-mail correspondence from Marci Weiderman, a Janus NSCC Service Manager raised concerns about the high frequency of trades made by Trautman in the Janus Institutional Money Market Account.  These concerns were dismissed by Defendant Newcomb who told Weiderman that her "folks" did not need to worry about being "cops" on the Trautman accounts as Newcomb would assume that role.  Defendant Newcomb stated that Janus is "definitely giving them [Trautman] some extra leeway because of their tight relationship with Warren", a reference to Lammert.

277.    The Janus Defendants were also aware that the volume of timing in Janus Funds was extremely high.  On November 4, 2002, Faye D. Banks, a Janus NSCC broker/dealer service

associate, e-mailed Weiderman, Mari, Avery and Janus employee John Leuthold ("Leuthold") a summary of market timing transactions in the Janus Funds for the months of September and October of 2002. Trautman traded 96 accounts during that period for a total of over one billion dollars in market timed transactions. The summary also reported 718 additional market timing transactions during that period involving 152 million dollars.

278.    Five minutes after that e-mail was sent, Avery e-mailed Leuthold informing him that Trautman had been "approved to time." Shortly thereafter, Leuthold forwarded this information to Beery, commenting "1 billion in trading activity. Wow."

### The 2002 Reports

279.    By the fall of 2002, the Janus Defendants appeared to make an effort to address the timing problem. In November 2002, an undated report on timing, produced by a Janus' Institutional Operations Team was circulated to many of the Janus Defendants. That report titled "Large Trades and Market Timing Procedures" (the "Team Report") noted that frequent trades in and out of a fund *could disrupt portfolio investment strategies and increase fund expenses* for all fund shareholders, including the long-term shareholders who were not responsible for generating these costs. Observing the Janus Funds were not intended for market timing or excessive trading, The Team Report describes the role of the Institutional Operations Team as regulating excessive trading by monitoring trades and placing restrictions on known market timers. The Institutional Operations Team's responsibilities included notifying portfolio managers of large trades and any trades that were believed to be market timing assets, and in providing the Fund Accounting Department with information that will make them aware of large inflows and outflows of money.

280.    At the same time, Whiston requested a "global analysis" of the market timing problems in order to quantify the magnitude of the problems and make recommendations to combat it going forward.  Janus employee, John Leuthold was placed in charge of the project and asked to prepare a written report.

281.    In November, 2002, Leuthold's report "Addressing Market Timing at Janus" (the "Leuthold Report") was distributed to many of the Janus Defendants including Whiston, Beery, Newcomb and James Levy ("Levy"), Product Development Director, as well as other Janus employees.

282.    The Leuthold Report summarized the problem at Janus and identified several adverse impacts that market timing had on mutual funds and their shareholders. Leuthold concluded that market timers hurt everyone except themselves by activity which diluted industry wide net asset value performance by up to 2% annually, or somewhere between one and four billion dollars a year.  In a November 7, 2002 draft of his report, Leuthold predicted that these costs could, under prevailing market conditions, soar to nearly six billion dollars a year.

283.    *In his analysis of Janus' experience with market timers, Leuthold quoted estimates that the timing activity ranged from 20 to 40 million dollars daily on a quiet day to 300 to 400 million dollars daily on days where there was a "big movement in the market."*

284.    The Leuthold Report recommended various changes in policy and process to enhance Janus' efforts to stop timing in the Janus Funds.  Few if any of these recommendations were followed.  Indeed, Leuthold concluded that one of the reasons Janus had been unable to effectively police market timers was that some timers were Janus-approved and thus not being monitored or policed at all. Clearly approved timers would not be hindered by the efforts of the

Institutional Operations Team, or any others who might be (apparently) charged with stopping timing.

285.    In a December 6, 2002 e-mail from Janus employee Steve Nasalrod to Leuthold, Nasalrod pointed out that Janus had only shut down between 46 and 226 timers per year over the past few years, and amount that seemed to Nasalrod "real small" considering how large the problem was in the industry and the size of Janus' customer base.  Nasalrod's conclusion was that Janus was "just not catching some folks."

**Janus' Ability to Catch Timing**

286.    Janus had the ability to monitor much of the market timing that occurred in its Funds and could act decisively, when it chose, to stop the practice.  In June of 2000, Rufenacht had announced to fund shareholders that, effective June 6 of 2000, the Fund would incorporate a 1% redemption fee on shares of the Fund that were owned for less than 90 days.  The reason for the implementation of this fee, Rufenacht explained, was that in order to make sound investment decisions it was critical that Janus do what it could to maintain a stable asset base in the High-Yield Fund.  Short-term trading, he explained, presented certain challenges to this approach including short-term trading costs and the lost opportunity represented by having to sell assets which if retained would benefit all of the Fund's shareholders.  In closing, Rufenacht explained that his objective was to protect the interests of the Fund's shareholders over the long-term, an objective which drove every management and investment decision Janus made.

287.    Janus had software programs that it could run to create a "business objects" report that would identify market timers and potential market timers. Indeed, by June of 2003, Janus' Defendants' accounting department had enhanced the software to include a formula that converted the shareholder activity to a percentage of net assets.

288.    As set forth in the Team Report, most companies would notify Janus prior to placing an unusually large trade, and Janus had the right to reject any purchase into an equity fund for any reason without notice if it believed it to be attributable to market timing or is otherwise excessive or potentially disruptive to the Fund.

289.    The Janus Defendants also had an internal procedure requiring that any large purchase relative to the size of the Fund "should be researched and approved" before the portfolio manager was to invest the assets.   This internal procedure also stated that Institutional Services may need to reject purchase orders if it is determined that the intent is to time the market and redeem the funds fairly quickly.

290.    Janus also had the ability to generate a shareholder master record to generate a shareholder transaction history and facilitate review of a potentially timed account.   This information allowed Janus access to reports that identified specific known market timers and identified specific restricted timing accounts.

291.    Janus' information systems gave the company the ability to generate meaningful reports to Janus management on timing activity for virtually any period.  *See* above.

292.    In a July 3, 2002 e-mail from Avery to a number of Janus employees, including Mari and Janus broker relations supervisor David Kelley ("Kelley"), Avery confirmed that Janus had been able to identify all of the Trautman accounts, "about a dozen" clearing through BAS and Donaldson Lufkin & Jenrette.

293.    On July 26, 2002, Avery advised Yee and a number of other Janus employees, including Marci Wiedemeier ("Wiedemeier"), NSCC Operations/Commissions Manager for Janus of the prior day's timing activity in excess of $20 million.

294.    On September 16, 2002, Defendant Newcomb identified seven entities that had market timed the Janus Global/International Funds for $67 million the prior month.

295.    On October 9, 2002, Janus employee Peter Young e-mailed Newcomb that Hartz (Canary Capital) had funded their account at Janus for $25 million on October 7th.  This e-mail was forwarded by Newcomb to George Hagerman ("Hagerman"), a Janus salesman on October 14th with a note that Hartz would be investing "another $50 million soon."

296.    Janus had the ability to act on this information to cut off future timer investments, and did so with certain timers who apparently never made it to the approved list. On February 13, 2002 Janus wrote to Donaldson Lufkin & Jenrette advising them to restrict their client under a specified account from buying additional shares of Janus Advisor Funds and exchanging them from or into that fund based on excessive trading language in the Janus prospectuses.

297.    On January 2, 2003 Janus developed a form letter for the Janus World Funds, over the signature of Christi K. Gujral, Chief Operating Officer of Janus International United, the lead distributor of the Janus World Funds, titled "Market Timing Policy." The letter reminded its investors that had been found to be engaging in market timing that such activity could be harmful to the fund and its shareholders and warned the timers that future excessive short-term trading would force the Funds to reject further purchase orders.

298.    On November 14, 2002 Newcomb consulted with Hagerman and Lammert on how to deal with some $50 million in market timing trades done by Broker-Dealer Brean Murray.  After reporting that he had called Brean Murray and asked them not to trade anymore, Newcomb inquired whether he should "ask them to go away totally, or not just move such a large amount."

299.    On November 14, 2002 Newcomb wrote to Hagerman and Defendant Sondenberg advising that Newcomb would like to ask market timer Signalert to "go away," asserting that he could "replace this with real money."

300.    On July 18, 2003, Garland wrote to Janus employees Thomas Fleck, Frank Lao ("Lao"), Director of Janus Institutional Operations, and others about the attempts of an unidentified market timer to invest in Janus through a broker identified as Metzler. Observing that the investment looked like it was coming from a market timer, Garland stated that he had no interest in this type of business, and asked Fleck to close the client down. In the same e-mail Garland chastised Lao for not picking up this type of investment and asked him to put in place a process to identify market timers. Garland explained that he wanted to close down all market timers in the Janus World Fund.

### (2)    The Janus Market Timing Initiative

301.    Instead of accepting the conclusions and implementing the recommendations of the Leuthold Report and the Team Report, or using the processes already in place to stop timing activity, the Janus Defendants instead initiated a new program called the "Janus Market Timing Initiative - January 2003", (the "Initiative") with the stated goal of evaluating current policies and procedures concerning market timing within Janus Capital Management and addressing any deficiencies with a more comprehensive approach. The Initiative quoted language in the February 2003 prospectus of Janus Equity Fund limiting shareholder rights to trade the fund, and announced that as of February 2003 Janus would implement a 1% redemption fee in a number of funds: the Janus Worldwide Fund, Janus Overseas Fund, Janus High Yield Fund, Janus Global Life Sciences Fund, Janus Global Technology Fund and the Janus Global Value Fund.

302.    The Initiative also listed a number of proposed "additional changes", including permanently removing exchange privileges, enacting a "movement towards a zero tolerance policy" on market timing, communicating from senior management to direct retail, continuing work on a daily report on large dollar trades, monitoring all exchanges "periodically", developing special enforcement efforts on accounts "below the radar screens", and implementing a full zero tolerance program, on excessive exchange offenders by 2005.  It also included a proposed schedule implementing the changes from 2003 to 2005.

303.    The Janus Defendants knew early on that the Initiative would not stop timing transactions.

304.    On February 3, 2003 Mari e-mailed Beery, with a copy to Leuthold, a list of "allowed market timers" which identified the timer, the accounts being timed, the salesman for the accounts, and the portfolio manager for the timed funds that had okayed the transactions. The timers identified in this e-mail include Trautman, CIBC and Tripod (a Canary entity).

305.    A February 19, 2003 e-mail from Mari to Leuthold, copying 33 other Janus employees, informed them that a number of brokerage firms would be exempt from the redemption fee at the discretion of Janus employee, Russ Parker ("Parker"), Director of Adviser Distribution for JCG.  These firms included: Merrill Lynch, American Express, AXA, Raymond James, Prudential, Smith Barney, Legg Mason, and MetLife.  Furthermore Mari also stated that 151 other "omnibus relationships" would not be able to support the redemption fee.  In Mari's own words, a "huge chunk" of the Janus institutional business would not be impacted by the redemption fees announced in the Initiative.

306.    Newcomb sent an e-mail on the same day asking whether Mari's memo on exceptions or exemptions to redemption fees generated any additional thoughts on Trautman.

Soderberg replied that "Janus knew Trautman times and will continue to time".  "I think he will have to abide by the rules."

307.    Throughout 2003 the Janus Defendants continued to approve more exceptions to the redemption fees.

308.    On April 2, 2003 at 5:58 pm   Janus employee Tannette Schneider e-mailed Garland and Lao with details of the timing capacity requested by James Nesfield [apparently for Canary], asking "[b]ased  on this, do you want to proceed with Nesfield?" Without hesitation, at 6:07 am the next day, Garland e-mailed his approval stating, "Go ahead.  We can always cancel if we are unhappy with their activity.  Make sure we have this clause in the agreement."

309.    In a June 3, 2003 memorandum from Levy to Garland, Levy set out the details of market timing arrangements that had been reached between Janus and Danny Sarfarti and Neil Kelley, both of Smith Barney.

310.    In a June 18, 2003 e-mail from Mari to Avery copying Garland, Wiedemeier, and Levy, Mari asked that AMEX Ikebana LLC be added to the list of approved timers. Mari noted that AMEX Ikebana had agreed to keep $15 million in three funds that it wouldn't time, and that the relationship was approved by Rufenacht (the portfolio manager) and Garland.

311.    The Initiative had become so obviously ineffective that Levy e-mailed Garland on June 24, 2003 proposing certain "consensus parameters" for permissible market timing of the Janus Funds be established so some sort of limits on timing could be enforced.

312.    On June 30, 2003 Mari notified Avery, Wiedemeier and others that Janus had approved Smith Barney to move between Janus International Fund Short-Term Bond Fund and International High Yield Fund up to 12 trips per year. Mari also stated that Janus' position on market timing had not changed, but Janus had made an exception with Sarfati due to his

positions in the Janus World Funds and the pre-approval from the Portfolio Managers of the Funds.

313.    That same day, in response to the above e-mail, Janus Employee Ron Smith wrote to Mari asking whether, despite the imposition of a concerted effort to eliminate timing, Janus seemed to be "approving just about everyone" as it allowed an "ever growing list of approved timers" to time.

314.    On July 23, 2003 Lao e-mailed Garland and the Janus International Legal Department, among others, identifying Pentagon Capital, B. Metzlar, Haidar Capital, Smith Barney, Nesfield Capital, Round Hill, First Allied, and RBC as JWF market timers.

315.    As late as September 2, 2003, the day before the announcement of the New York Attorney General investigation against Janus, Avery sent Mari specific details on some $220 million in timer assets invested with Janus by Defendant Trautman as of August 29, 2003 as well as an additional $16 million in timer assets invested by Janus in Ikebana.

316.    Later on that day Avery followed up with an additional e-mail identifying some over $30 million in timer assets as of August 29, 2003 invested by Shorewood LLC, Thornberry Hill LLP, and Round Hill.

317.    The Janus Defendants breached their fiduciary duties and contracts with the Funds by acting with complete disregard for the Funds' market timing policies, as stated in the Prospectuses and the provisions of their contracts which required the Janus Defendants  act in compliance with these policies and with the relevant laws.

318.    An e-mail exchange between Garland and Levy demonstrates the contempt with which the Janus Defendants regarded such policies.  In a message from Levy to Garland dated May 28, 2003 Levy described the timing policies of Janus' "biggest competitors" by quoting

their prospectuses. On May 28, 2003 Garland responded, "I do not mean the prospectus language. I mean their ACTUAL market timing policy." (Emphasis in original).

### Personal Profits to Managers

319. The Janus Defendants breached their duties to the Funds and the Plaintiffs because market timing was profitable for them personally, as well as for JCG, JCM and the other Janus entities.

320. Whiston's January 1, 2003 Employment Agreement provided for an annual bonus ranging from $0 to $11,460,000 based on the factors of operating income, fund performance, and *gross new sales*. Beery and Soderberg had similar compensation arrangements.

321. E-mail correspondence dated September 13, 2002 between Ian Loughlin of Janus and Hagerman establishes that Hagerman and Newcomb earned commissions on the Trautman transactions, based on a percentage of the assets Trautman invested in the Janus Funds.

322. The need to attract and retain new money into the Janus funds was pervasive in the Company's discussions of the market timing issue. A Janus document entitled "2003 June Monthly Report - RIA" identifies as a key initiative for July "retention, retention, retention!" noting that it will be a major challenge to "keep assets across several strategies" including the International, Global and High Yield Funds.

323. The Janus Defendants' disregard for their duties to the Janus Funds and their overriding concern for their own interests is reflected by the fact that the Janus Defendants often used the systems put in place to enable them to identify timing transactions not to stop timing activity, but instead to track the *permitted* timing in the Funds in order to assure that sufficient sticky assets were in place to make the *permitted* timing profitable for them.

324.    On June 17, 2003 Garland, in an e-mail titled "Market Timer Business from American Express," asked Levy to work with Defendant Newcomb in getting the "sticky money" into the INTEC Fund.

325.    On July 9, 2003, Newcomb responded to a question regarding allowing Round Hill (Fletcher Brand Partners) to time the Janus Worldwide and Overseas Funds with a question, "how much 'sticky' money have they given us?"

326.    In a July 2, 2003 e-mail to Mari regarding approved timers, Eric Gerth explains that a certain AMEX broker is being allowed to time "because of the sticky money."

327.    A rationale behind Janus' decision to permit the continued timing of its funds is set forth in a June 11, 2003 e-mail from Levy to a number of fellow Janus employees, including Garland, Newcomb and Mari.  The e-mail explains that Janus' stated policy is to not tolerate timers, but that it will make exceptions to that policy under certain specified parameters "when pressed" and when it believes that allowing a controlled amount of timer activity, "will be in JCG's best interest (increased profitability to the Firm)".

### (3)    Janus' Settlement with the Regulators

328.    On August 18, 2004 Janus announced it had settled an SEC enforcement action and two other state regulatory actions for entering into the undisclosed market timing agreements with certain investors.

329.    The SEC enforcement action was coordinated with The Offices of the New York Attorney General, the Colorado Attorney General and the Colorado Division of Securities.

330.    Janus Capital Management, the Adviser,  was ordered by the SEC to pay disgorgement of $50 million and *civil penalties of $50 million*.  JCM also consented to a cease

and desist order and censure and agreed to undertake certain compliance and mutual fund governance reforms.

331.    In its Order, the SEC found that:

●    JCM negotiated market timing agreements with 12 entities pursuant which these entities were permitted to market time certain Janus Funds. At the same time JCM entered into these agreements, the prospectuses for the funds being timed stated, or at least strongly implied that JCM did not permit frequent trading or market timing in these funds.

●    Some of JCM's market timing agreements were entered into with the understanding that the market timer would make long-term investments, so-called "sticky assets," in certain Janus Funds. In addition, JCM waived all redemption fees that would have otherwise been assessed against the market timers for their frequent trading activity.

●    While the timing activity by the market timers caused dilatation to the affected mutual funds, the market timing agreements financially benefited JCM in that JCM realized additional advisory fees from the timed funds and sticky assets under its management. Because of JCM's financial interest in the increased assets under management, JCM had a conflict of interest with the Janus Funds subject to the market timing agreements. JCM failed to disclose the conflict of interest to the Board of Trustees and the shareholders of the affected mutual funds, thereby breaching JCM's fiduciary duty to the mutual funds.

Based on this conduct, the Commission's Order finds that JCM willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act and Section 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder, JCM consented to the entry of the Commission's Order without admitting or denying the findings.

332.    Pursuant to the SEC's Order, JCM agreed to make certain changes, among many others, to its governance policies and practices:

i.    No more than 25 percent of the members of the Board of Trustees of any Janus fund will be persons who either (a) were directors, officers or employees of JCM at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company act, of the fund or of JCM. In the event that the Board of Trustees fails to meet this requirement at any time due to the

death, resignation, retirement or removal of any independent Trustee, the independent Trustees will take such steps as may be necessary to bring the Board in compliance within a reasonable period of time;

ii.     No chairman of the Board of Trustees of any Janus fund will either (a) have been a director, officer or employee of JCM at any point during the preceding 10 years or (b) be an interested person, as defined in the Investment Company Act, of the fund or of JCM; and

Any person who acts as counsel to the independent Trustees of any Janus fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act.

### (4)     Trautman Times the Janus Funds with Permission

333.    Defendant Trautman was the most active timer of the Janus Funds, and conducted its timing trades with full knowledge and approval of the Janus Defendants.  Troutman began timing the Janus Funds with the knowledge and consent of the Janus Defendants in 2001 when Lammert, then portfolio manager of Janus Mercury Fund, introduced Greg Trautman, Trautman's CEO, to Janus employees.

334.    On March 11, 2002, at the request of Lammert, Soderberg contacted Greg Trautman requesting a meeting with Trautman to discuss "some of our available products." Greg Trautman arranged for Trautman employees James Wilson and Scott Christian to do the appropriate follow up, and expressed his appreciation for the opportunity "to work with the Janus family" and his hope for a long and mutually-rewarding relationship.

335.    The same day Trautman and Lammert  exchanged a series of e-mails concerning what international funds would be open for a timing investment, with Trautman suggesting Janus Adviser International.  Whiston, who was copied on the e-mail exchange told Lammert that Soderberg "talk him [Trautman] through" the available funds.

336.    The Janus/Trautman relationship flourished and was beneficial to both Trautman and the Janus Defendants.  On May 2, 2002 Lammert, Newcomb and Rufenacht met with Greg Trautman and Jim Wilson of Trautman and made a presentation regarding Janus. The enthusiasm for the "partnership" with Trautman was openly expressed in a later exchange of e-mails between Defendant Newcomb and Rufenacht that same day. Newcomb told Rufenacht that his presentation was "awesome", and said, "I think we can ask them for as much money as you are willing to let go out on any given day."  "Give me the word and you will get the money", Newcomb told Rufenacht.

337.    On April 8, 2002 Wilson wrote Newcomb advising him that Trautman had invested $25.8 million into the Janus Adviser International Fund, and asking him for a "very, very recent update on Janus Mercury Fund and JIGRX," explaining that Trautman needed the top five holdings and percentage of the currency risk in the funds.  The following day Newcomb responded to Wilson, copying Hagerman promising the information the following day and asking whether the trade was coming through the Bank of America account.

338.    On April 23, 2002, Scott Christian e-mailed Wiedemeier explaining that a Trautman client would much rather process a proposed trade as an exchange between two Janus funds as opposed to as a sell and a buy.  In response Wiedemeier forwarded the request to Newcomb, and after speaking with Newcomb, Kelley and Hagerman she advised them and Mari that she would work on setting up the funds to allow the exchanges that Trautman requested.

339.    The amount of money Janus received from Trautman was significant as was the extensive timing Janus allowed Trautman to conduct. The Janus Defendants were kept fully informed of this activity, both through their close relationship with Trautman and through the internal tracking procedures Janus had set up to identify timing activity.

340.    As Newcomb advised Lammert and Hagerman on November 14, 2002 (Newcomb always knew how much Trautman was trading because Trautman let him know about the trades by e-mail.    A typical communication was a July 16, 2003 e-mail from Scott Christian to Newcomb, Kelley and Avery confirming that on that day Trautman had redeemed out of the JMRX Funds and into the JMIX Funds some $49 million.

341.    On July 25, 2003 Christian sent a similar communication to Newcomb, Kelley and Avery involving over $15 million in purchases that day in several Janus funds.

342.    In a May 2, 2002 e-mail Kelley advised Newcomb, Hageman, Wiedemeier and Mari among others, on May 1, 2002 Trautman market timed $58 million between the Janus Adviser Money Market Fund and the Janus Adviser International Fund..

343.    A June 28, 2002 e-mail from Kelley to a Janus distribution of 27 employees, including Hagerman, Mari, Defendant Newcomb and Wiedemeier reported that Trautman market timed $56 million in funds between the Janus Institutional Money Market Fund and the Janus Adviser Worldwide and Janus Adviser International Funds on June 27, 2002.

344.    Between September 1 and October 31, 2002, ninety-six accounts were traded by Trautman *with over $1 billion of fund money timed.*  By October 2002 Trautman's investment in Janus Funds had reached $100 million.

345.    Trading by Trautman in and out of the Mercury Fund reached $50 million in one week in November 2002 alone.

346.    By March 2003 Trautman's investments of sticky assets in the Janus Funds had reached $300 million.

347.    An e-mail from Avery to Mari dated August 30, 2003 stated that Trautman had over $500 million invested in Janus, with no restrictions on the frequency of trades.

348.    According to a September 2, 2003 e-mail from Avery to Mari, on August 29, 2003 Trautman had a total of over $221 million in assets invested in the following five Janus Funds: Janus International Fund Worldwide, Janus International Fund Risk Managed, Janus International Money Market Fund, Janus Adviser One Worldwide and Janus Adviser One International.

349.    Trautman's status as an approved market timer was not charged during the Janus Defendants' late 2002-early 2003 investigations to identify and limit market timing. On the contrary, the Janus Defendants continued to cooperate with Trautman to meet any special needs. -- in part because of Trautman's willingness to balance its requests for increased timing capacity with a commitment, as evidenced in a February 27, 2003 e-mail from Scott Christian to Newcomb, to invest "static money" as well.

350.    As alleged above, Janus employees investigating timing in the Janus Funds were routinely informed by the Janus Defendants that Trautman had permission to time.

351.    On February 13, 2003 Kelley, e-mailed Wiedemeier requesting that she turn on "UEX" to allow exchanges to and from Janus International Fund Worldwide and Janus International Fund Institutional Money Market, explaining that Trautman had received authorization from Janus Institutional Sales to allow exchanges between these funds. On February 18, Wiedemeier forwarded the e-mail exchange to Mari and Avery for their information about another timing fund allowed for Trautman.

352.    In order to facilitate its timing decisions Trautman, often requested and received from Janus information on specific Janus Funds, holdings and strategies which were not readily available to other investors. When David Corkins replaced Lammert as a portfolio manager for

Janus Mercury Gregory Trautman's request to meet with him was facilitated by Newcomb, and followed by a $90 million allocation of Trautman's funds at Janus to the "long side."

353.    According to a June 10, 2003 e-mail from Newcomb to Scott Christian, Newcomb gave his new boss (presumably Corkins) a "blueprint" of the Janus/Trautman relationship, which his superior thought "was really cool."

354.    In October 2002, the Janus Defendants invited Scott Christian to New York to join Jim Goff, Janus' Director of Research, and a team of Janus portfolio managers for an investment team forum in November.

355.    Although issues occasionally arose within Janus over the allocation of the Trautman's investments between the various Janus Funds.  The Janus Defendants were willing to work with Trautman to find a way to comply with Trautman's wishes.

356.    On June 30, 2003 Kelley advised that Trautman's deal with Newcomb, per Scott Christian at Trautman was that Trautman would always have $70-$90 million in "Fund 510" and that they would only time $10-$20 million between to/from Fund 851.

357.    On July 15, 2003 Trautman deposited $76 million into Janus Mercury Fund, an amount Scott Jones noted in an e-mail the following day to Avery was 1% of the Fund's assets.

### (5)    Canary Times Janus "Under the Wire"

358.    Canary timed the Janus Funds both "under the wire" and with the Janus Defendants' permission.  E-mail messages between Andrew Goodwin ("Goodwin") of Canary and a third party intermediary, Clearco.com in April 2000 confirm that Canary was timing Janus Funds, and Canary's positions were "seasoned" or could be leveraged.  Canary continued to trade through Clearco.com at least through February 2002.

359.    An internal Canary e-mail exchange between Goodwin and Noah Lerner ("Lerner"), shows that at least by September 25, 2000 Canary and Security Trust Corporation ("STC"), another third party intermediary, were towards setting up a negotiated timing arrangement for Canary with Janus.   By November 3, 2000 Nicole McDermott of STC confirmed that Janus Funds were on STC's account list.

360.    Canary also worked through James Nesfield of Nesfield Securities to gain timing capacity in the Janus funds.   E-mails between Nesfield and Goodwin beginning in November confirm that Nesfield was canvassing numerous fund families and brokers on behalf of Canary exploring omnibus or under the wire timing in various funds including the Janus Funds.

361.    By early 2001 Canary was timing in the Janus Funds with the assistance of STC. STC set up accounts for Canary to time some Janus Funds in omnibus trades or under the wire. In June 2001 Bank of America provided the box to Canary on which it traded in Janus.   E-mail exchanges between Stern and Goodwin and Michael Boston and Theodore Siphol of BAS confirm this arrangement.

362.    A September 19, 2001 e-mail from Matthew S. Curley, First Vice President-Investments, for Defendant Smith Barney to Stern confirms arrangements for timing capacity in Janus Growth (Mercury) Fund offered by Smith Barney.

363.    From late 2001 through at least September 2002 Defendant WSG also provided Canary with timing capacity in several mutual funds including Janus offshore and domestic funds as confirmed by an e-mail dated March 26, 2002 from Todd Everts of WSG to Stern.   On May 3, 2002 Tom Butcher of Canary informed Lerner that Everts had said Janus World Stock, a $1.1 billion fund was open and recommended trades in the range of ¼%-1/2% in an e-mail dated May 15, 2002.

364.    Canary also timed Janus Funds through Brean Murray, as is confirmed by a November 4, 2002 e-mail message from Kelley Michael Grady of Brean Murphy explaining how to get around Janus' prohibition on initial purchases in the Janus Institutional Money Market Fund being made through NCSS platform.

365.    On January 3, 2003 Grady reminded Lerner that Brean Murphy had secured an additional $2 million capacity in Janus Aspen Worldwide Growth Fund, bringing Canary's capacity to $4 million in that fund.

366.    Beginning as early as January 13, 2003, Canary worked with independent consultant David Byck to obtain capacity in the Janus High Yield Fund according to an e-mail exchange between Byck and Lerner.

367.    On January 17, 2003, Byck e-mailed canary its account number at Janus stating "[i]t's imperative that we let Janus know before the wiring of the funds." Byck informed Canary that Janus was willing to waive the 1% redemption fee ONLY if sticky assets are held "directly at the Fund itself."

368.    By June 17, 2003 Byck offered Canary more capacity in the Janus Funds, *i.e.* $10 million to Janus High Yield Offshore and $50 million for Janus High Yield. A July 17, 2003 e-mail also confirms this deal.

### (6)    Canary's Negotiated Timing in Janus

369.    In June 2001 Marran of STC arranged a meeting between Hagerman and Shipman of Janus and Stern of Canary. In an e-mail of June 27, 2001 Hagerman sent Stern his cell phone number. At the time of this initial meeting Janus was requiring too much in sticky assets for Stern, so no deal was made.

370.    On November 2, 2001 Nesfield reported to Lerner that he had contacted Bailey, the "head of Janus" regarding timing capacity.  Stern responded on November 3, 2001 that if Nesfield could "get a telephone appointment or face to face with Bailey I [Stern] will do the rest."

371.    Beginning in November 2001, or earlier Canary received the Janus Defendants' permission to time certain Janus Funds, including the Janus Mercury Fund in exchange for sticky assets.

372.    In exchange, Canary agreed to park money (*i.e.,* sticky assets) in a Janus money market fund.  Canary timed the Janus Mercury Fund during 2002 and 2003.  Canary received permission from Janus to time the Janus High Yield Fund as well.

373.    In early 2003, Canary sought timing capacity in Janus' offshore funds.  Through Nesfield, Canary contacted JCM and offered to park more "sticky" assets with the Janus Defendants in exchange for this additional timing capacity.

374.    In response, a concerned Janus employee sent e-mails to Garland, the CEO of Janus International, expressing alarm over the volume of market timing activity in Janus Funds:

> I'm getting more concerned w/ all of these market timers and how they are affecting our PM's [i.e., Portfolio Managers] trading activity. [Portfolio Managers] have voiced their sensitivity on a number of occasions re: this type of activity in JWF. I spoke to [a Janus employee] and confirmed that this is a big problem domestically and I want to avoid this at all cost before it gets too problematic offshore. Now that we have our exchange limitation in our prospectus, I would feel more comfortable not accepting this type of business because its too difficult to monitor/enforce & it is very disruptive to the PM's & operation of the funds. Obviously, your call from the sales side.

375.    The same Janus employee also recommended to Garland that Janus refuse the additional business from Canary due to the issues created for portfolio managers: "For now, I don't think we should take-on additional business of this nature…. We need to keep our funds clean & minimize [sic] issues for PM's/fund performance.  Do you agree?"

CAFDC:  04-md-15863-03

376.    Garland did not agree.  He replied:

I have no interest in building a business around market timers, but at the same time I do not want to turn away $10-$20m! How big is the [Canary] deal….?

377.    *After learning that Canary's timing could amount to between $10 and $50 million, Garland approved Canary's additional timing capacity on April 3, 2003.*  The new agreement with Canary was never finalized, however.

378.    By April 3, 2003 Tannette Schneider, Assistant to Garland, e-mailed Stern directly a fund matrix which outlined the available offshore funds and limits on market timing, noting "we have very strict guidelines regarding market timing in the Prospectus, however we can discuss the flexibility of these guidelines."

379.    In early June, 2003, several Janus employees commented on the practice of timing:

"Our stated policy is that we do not tolerate timers. As such, we won't actively seek timers, but when pressed and when we believe allowing a limited/controlled amount of timing activity will be in JCG's best interests (increased profitability to the firm) we will make exceptions under these parameters."

"My own personal recommendation is not to allow timing, period, and follow the prospectus…. [T]imers often hide multiple accounts and move on the same day which could hurt other investors…. I don't think the static assets [i.e., sticky assets] that we might be able to hold onto are worth the potential headaches, nor does this fall into our 'narrow and deep' focus.  I suggest we maintain the timing agreements we have, but allow no more."

"[I]f we are going to allow timing, we want to be sure that there are enough static assets [i.e., "sticky" assets] so that we are making a decent profit for all the trouble we are put through."

380.    According to a February Complaint filed by the State of New York against Grant Seeger, William Kenyon nnand Nicole McDermott, the foregoing individuals (who were the Chief Executive Officer, president and Senior Vice President of Corporate Services of STC, respectively, misrepresented and directed STC employees to misrepresent that Canary trades

were actually trades originating from retirement and pension plans (which are allowed to pace trade orders after 4 p.m.). According to the February complaint identified above, STC placed *late trades* for Canary for, *inter alia*, shares of The Janus Worldwide Fund.

### (7)   **Security Trust Corporation Times the Janus Funds**

381.    STC, the now defunct Arizona intermediary, worked directly with Russ Shipman of Janus to facilitate timing in the Janus Funds as early as the 1990's. In an e-mail sent to Canary's Stern and Seeger, on June 22, 2001 Marran of STC said he had worked with Shipman at Janus for several years dating back to the inception of his [Marran's ] "same day/late day trading platform."

382.    STC entered into an agreement with Canary to facilitate *late trading and timing* in May 2000 through which Canary gained the capability of submitting orders until 8:30 p.m. New York time.

383.    February and March of 2001 e-mail correspondence between A. Goodwin and Daniel Printz of STC establishes that STC and Canary developed capacity for Canary to time Janus Funds. By March 20, 2001, Printz e-mailed Goodwin informing him that he [Printz] would contact Janus directly to make sure the Canary trading account at Janus was set up correctly.

384.    An April 2001, e-mail exchange among Goodwin, Stern and Printz establishes that STC had received capacity in 90% of the funds Canary requested, including setting up accounts for Canary to trade in several Janus Funds. Goodwin thanked Printz for his assistance.

385.    On May 6, 2001 Goodwin e-mailed McDermott a list of various other funds Canary was interested in timing.

386.    By May 21, 2001, an e-mail from Ramona Gabera of STC to Goodwin, as well as Printz and McDermott, stated that Canary had almost $2 million invested in the Janus Worldwide Mutual Fund account.

387.    STC and Canary continued to work together to negotiate capacity in Janus Funds, and on June 18, 2001 Printz informed Goodwin that Canary could start timing twenty-three new funds on June 22, 2001.  On June 22, 2001, Stephanie Gloria of STC confirmed that all accounts were set up for funding and trading by Canary.  *Three of these were Janus Funds.*

388.    STC provided Canary with a means to time various Janus Funds well into 2002. However, by May 22, 2002, Goodwin e-mailed Stern that Goodwin believed STC was aware that he was unhappy with STC's difficulty in supplying Canary with timing capacity.  STC was then offering Canary $2 million of space.

389.    Most of STC trades were cleared through BAS.

### (8)    Smith Barney Times the Janus Funds

390.    At least as early as September 2001 Smith Barney was facilitating (as intermediary) timing in Janus Growth (Mercury) Fund for Canary.  With permission of the Janus Defendants, Smith Barney also market timed the Janus International Funds' Short-Term Bond, High Yield, and U.S. Dollar Reserve Funds from October 2002 through August 2003.

391.    Under a procedure approved by the Janus Defendants Sarfati, Smith Barney's Vice President-Investments, contacted Janus salespersons several hours in advance of upcoming trades.  These salesmen would then call Rufenacht for approval.

392.    The initial trade maximum for Smith Barney was $10 million, an amount which ultimately was increased to $40 million.

CAFDC:  04-md-15863-03

393.    A June 6, 2003 e-mail from Levy to Garland states that Smith Barney's Sarfati at that time was trading about $37 million in chunks of $15 million, $15 million and $7 million between the High Yield and Money Market Funds.

394.    Janus personnel who knew of and facilitated Smith Barney's market timing included Garland, Newcomb, Levy, Lao, Mari, Rufenacht and Jason Schindler.

### (9)    The CIBC Time and Facilitate Timing in the Janus Funds

395.    CIBC was listed on Janus' records as trading through Banc of America between the Institutional Money Market and Advisor Worldwide Funds.  The Janus personnel responsible for the account were Hagerman and Newcomb.  Investments had to be approved by the portfolio managers, who were identified as Helen Hayes and Lammert.  CIBC also traded through Trautman using the BAS box.

396.    In a chart titled "Approved Market Timers" that was attached to an August 22, 2003 e-mail from Scott Jones to Jeb Avery ("Avery"), Manager of Institutional Services for Janus, the value of the CIBC accounts at Janus was given as $114 million.

397.    Another e-mail dated 9/22/2003 demonstrates that CIBC was authorized to trade in the Janus International Funds High Yield Fund on July 21, 2003, but never funded the account.

398.    During the relevant time period the CIBC Defendants lent money to timers, including Canary, to finance timing trades, and provided a clearing platform to execute timing trades, in a number of mutual funds, including the Janus Funds.

399.    The CIBC Defendants' financing and clearing activities increased timers' ability to time the Janus Funds, which gave rise to additional harm to the Janus Funds.

400.    Upon information and belief the CIBC Defendants charged fees for the services they provided to facilitate timing.

### (10)    Haidar Capital Management Times the Janus Funds

401.    According to a September 2003 chart of market timers, Haidar started timing the Janus Funds October of 2002, and was terminated as a timer on August 27, 2003.  Haidar's trading was capped at 1% of the High Yield and U.S. Dollar Reserve Funds.  Haidar was specifically not allowed to time in Global Technology, Global Life Science, Core Equity or Balanced Funds.

402.    An August 9, 2002, e-mail from Jack Clough ("Clough"), Internal Wholesaler for Janus International to Rufenacht states that  despite concerns expressed by Garland, over allowing Haidar to time, Haidar was a "good guy" and would not be trading as often as Garland thought.  Clough represented to Rufenacht that Haidar was willing to call a day or more in advance of trades, would put $5-$10 million in initially, and then $50-$60 million within 3 weeks with more investments likely.  According to Clough, Haidar was looking for "another reason to keep sending you money."  That same day Clough sent an e-mail to Garland, Rufenacht, and Newcomb stating that Haidar would be moving money from Janus High Yield to Janus Short Term on a few days' notice.

403.    On August 10, 2002, Lao sent an e-mail to Garland and others advising that Rufenacht was okay with Haidar timing the High Yield and the Short Term Bond Funds.

404.    According to an August 21, 2002, memorandum of a meeting between Liz Trevor, Lao, and Kristina Carrico for Janus, and Joe O'Brien, Said Haidar and Brian Hicks for Haidar, the *arrangement between Haidar and Janus was one exchange every few weeks, depending on the market*.  Haidar would trade directly, not through the "NSCC" and Haidar

would let portfolio manager Sandy McPheal know in advance of trades.  At that meeting, Said Haidar represented that they would deposit $5-$10 million with Janus when the "agreement, etc." is "organized", with $20 million additionally being invested within the next month and a half.

### (11)    Timing Policies Disclosed in the Janus Prospectuses

### Purchases

405.    The Prospectuses issued for the Janus Funds specified (using substantially the same language and under the heading "Purchases") represented that there was a policy that excessive purchasing of the portfolios shares was not tolerated, as the Portfolio was not intended for excessive trading or market timing.  In this regard, the Janus Funds' prospectuses included the following statements:

> "The Portfolio is *not intended for excessive trading or market timing*. Excessive purchases of Portfolio Shares disrupt portfolio management and drive Portfolio expenses higher.  The Portfolio reserves the right to reject any specific purchase order, including exchange purchases, for any reason."

406.    This statement appeared in at least the following Janus Funds Prospectuses:  Janus Aspen Series Service II Shares, Preliminary Prospectus, dated and filed on October 18, 2001, Shareholder Guide at p. 15 (Emphasis in original); Janus Adviser Series, Prospectus, Post Effective Amendments 2 & 4, dated and filed on July 31, 2001 (same, except word Portfolio is replaced with "Fund"), Janus Adviser Series p. 42; Janus Aspen Series Service II Shares – Preliminary Prospectus, dated and filed on October 18, 2001, Janus Aspen Series p. 16 (same but without  emphasis in original); Janus Aspen Series Institutional Shares (Service I and II) Prospectus, dated and filed  on May 1, 2002 and February 21, 2002, respectively, Shareholder Guide at p. 47; Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 6 & 7, dated  and  filed  on  September  30,  2002 and September 26, 2002,

respectively (same except word Portfolio is replaced with "Fund"); Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 7 & 8, dated and filed on December 31, 2002 and October 17, 2002 (same except word Portfolio is replaced with "Fund"); Janus Aspen Series Service Shares Prospectus, dated and filed on December 31, 2002 and December 30, 2002, respectively, page number not available; Janus Aspen Series Institutional Shares Prospectus, dated and filed on May 1, 2003 and February 26, 2003, respectively, page number not available; Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 12 & 13, dated and filed on June 2, 2003 and April 3, 2003, respectively (same except word Portfolio is replaced with "Fund"); Janus Adviser Series (I Shares, C Shares) Prospectus, Post Effective Amendments 13 & 14, dated and filed on April 17, 2003 (same except word Portfolio is replaced with "Fund"); Janus Aspen Series Institutional Shares, Prospectus, dated and filed on May, 1, 2004 and April 26, 2004, respectively, page number not available; Janus Adviser Series (I Shares, C Shares) – Prospectus – Post Effective Amendments 13 & 14, dated and filed on April 17, 2003; Janus Small Cap Value Fund Prospectus, dated and filed on April 17, 2003.

407.    In fact, as was set forth in the Prospectuses issued for the Janus Funds, it was the explicit policy of the Janus Funds to <u>refuse</u> purchase orders, and <u>suspend or terminate exchange privileges</u>, if its policies concerning excessive purchases were not followed.  In this regard, the Janus Funds' prospectuses included the following statement:

> "For example, purchase orders may be refused if the Portfolio would be unable to invest the money effectively in accordance with its investment policies or would otherwise be adversely affected due to the size of the transaction, frequency of trading or other factors. The Portfolio may also suspend or terminate your exchange privilege if you engage in an excessive pattern of exchanges. For more information about the Portfolio's policy on market timing, see "Excessive Trading" on the next page."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Aspen Series Service II Shares, Preliminary Prospectus, dated and filed on October 18, 2001, Shareholder Guide at p. 15; Janus Adviser Series Prospectus, Post Effective Amendments 2 & 4, 7/31/2001 & 7/31/2001, except word Portfolio is replaced with "Fund", Janus Adviser Series at p. 42; Janus Adviser Series (Class I Shares, Class C Shares) – Prospectus, Post Effective Amendments 6&709/30/02 & 9/26/2002 except word Portfolio is replaced with "Fund"; Janus Adviser Series (Class I Shares, Class C Shares) – Prospectus, Post Effective Amendments 7& 8, dated and filed on December 31, 2002 and October 17, 2002, respectively (same except word Portfolio is replaced with "Fund"); Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 12 & 13, dated and filed on 6/2/2003 & 4/3/2003, respectively (same except word Portfolio is replaced with "Fund"); Janus Adviser Series (I Shares, C Shares) – Prospectus – Post Effective Amendments 13 & 14, dated and filed on April 17, 2003; Janus Small Cap Value Fund Prospectus, dated and filed on April 17, 2003.

408.    Similarly, the Janus Aspen Series Institutional Shares Prospectus, dated and filed on May 1, 2001 and February 4, 2001, respectively, Shareholder Guide at p. 43, set forth, using similar language, a policy that excessive purchasing of the portfolios shares was <u>not permitted</u>:

> "The Portfolios do not permit excessive trading or market timing. Excessive purchases of Portfolio Shares disrupt portfolio management and drive Portfolio expenses higher. Each Portfolio reserves the right to reject any specific purchase order. Purchase orders may be refused if, in Janus Capital's opinion, they are of a size that would disrupt the management of a Portfolio. The Portfolios may also suspend or terminate your exchange privileges if you engage in an excessive pattern of exchanges."

**<u>Redemptions</u>**

409.    The Janus Funds' stated redemption policy set forth in the Prospectuses (using substantially the same language and under the heading "Redemptions") was that redemptions

would be processed at the NAV next calculated after receipt and acceptance of the redemption order.  In this regard, the Janus Funds' Prospectuses set forth that:

> "Redemptions, like purchases, may be effected only through the separate plan accounts of participating insurance companies or through qualified plans … Redemptions are processed at the NAV next calculated after receipt and acceptance of the redemption order by the Portfolio or its agent, minus the redemption fee, if applicable."

This statement, or a substantially similar statement, appeared in at least the following Janus Funds Prospectuses:  Janus Aspen Series Service II Shares, Preliminary Prospectus, dated and filed on October 18, 2001, Shareholder Guide at p. 15-16; Janus Adviser Series Prospectus, Post Effective Amendments 2 & 4, dated and filed on July 31, 2001, Janus Adviser Series page 42-43;

410.    More recently, however, comparable statements in the Prospectuses were augmented as follows:

> "Please contact your financial intermediary or plan sponsor, or refer to the appropriate plan documents for details including any restrictions on redemptions, redemption charges, redemption in kind, automatic redemption and delays in honoring redemption requests … Shares of any Fund may be redeemed on any business day.  Redemptions are processed at the NAV next calculated after your redemption order is received in good order by the Fund or its agent."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Investment Fund, Post Effective Amendment No. 110 & 93, Janus Equity Funds Prospectus, dated and filed February, 2004 and December 23, 2003, respectively, Janus Equity Funds p. 54.

**Excessive Trading**

411.    The Janus Funds' Prospectuses (using substantially the same language and under the heading "Excessive Trading") set forth their policy against market timing and excessive trading.  As the Prospectuses explained, such trading could disrupt the portfolio investment strategies and increase expenses for all shareholders, including long-term shareholders.  In fact, the Prospectuses specifically delineate the various transactions that could be refused without

CAFDC:  04-md-15863-03

prior notice, "particularly orders that the Portfolio believes are made on behalf of market timers…" In this regard, the Prospectuses state as follows:

> "Frequent trading into and out of the Portfolio can disrupt portfolio investment strategies and increase portfolio expenses for all shareholders, including long-term shareholders who do not generate these costs. *The Portfolio is not intended for market timing or excessive trading.* The Portfolio and its agents reserve the right to reject any purchase request (including exchange purchases if permitted by your insurance company or plan sponsor) by any investor or group of investors indefinitely if they believe that any combination of trading activity in the account(s) is attributable to market timing or is otherwise excessive or potentially disruptive to the Portfolio. The Portfolio may refuse purchase orders (including exchange purchases) for any reason without prior notice, particularly orders that the Portfolio believes are made on behalf of market timers…. Transaction place through the same insurance company or plan sponsor on an omnibus basis may be deemed part of a group for the purpose of this policy and may be rejected in whole or in part by the Portfolio. Transactions accepted by an insurance company or plan sponsor in violation of our excessive trading policy are not deemed accepted by the Portfolio and may be cancelled or revoked by the Portfolio on the next business day following receipt from the insurance company or plan sponsor."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Aspen Series Service II Shares, Preliminary Prospectus, dated and filed on October 18, 2001, Shareholder Guide at p. 16; Janus Aspen Series Institutional Shares (Service I and II) Prospectus, dated and filed on May 1, 2002 and February 21, 2002, respectively, Shareholder Guide at p. 47-48; Janus Aspen Series Service Shares Prospectus, dated and filed on December 31, 2002 and December 30, 2002, respectively, page number not available; Janus Aspen Series Institutional Shares Prospectus, dated and filed on May 1, 2003 and April 26, 2003, respectively, page number not available; Janus Aspen Series Institutional Shares Prospectus, dated and filed on May 1, 2003 and February 26, 2003, respectively, page number not available; Janus Adviser Series Prospectus, Post Effective Amendments 2 & 4, July 31, 2001 (same except each reference to "Portfolio" is replaced with "Fund", "insurance company or plan sponsor" is replaced with "financial intermediary" or "intermediary", and entire passage before break is emphasized in

original), Shareholder Guide at p. 43; Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 6 & 7, dated and filed on September 30, 2002 and September 26, 2002, respectively (same as statement in Post Effective Amendments 2 & 4); Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 7 & 8, dated and filed on December 31, 2002 and October 17, 2002 (same as statement in Post Effective Amendments 2 & 4); Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 12 & 13, dated and filed on 6/2/2003 & 4/3/2003, respectively (same as statement in Post Effective Amendments 2 & 4); Janus Adviser Series (I Shares, C Shares) – Prospectus – Post Effective Amendments 13 & 14, dated and filed on April 17, 2003 (same as statement in Post Effective Amendments 2 & 4).

412.    In addition, certain of the Janus Prospectuses explicitly stated that the Portfolios did not permit frequent trading or market timing, which practices "may make it very difficult to manage a Portfolio's investments."

> "Excessive trading of Portfolio shares in response in [sic] short-term fluctuations in the market – also known as "market timing" - - may make it very difficult to manage a Portfolio's investments. The Portfolios do not permit frequent trading or market timing. When market timing occurs, a Portfolio may have to sell portfolio securities to have the cash necessary to redeem the market timer's shares. This can happen at a time when it is not advantageous to sell any securities, which may harm a Portfolio's performance. When large dollar amounts are involved, market timing can also make it difficult to use long-term investment strategies because the portfolio manager cannot predict how much cash a Portfolio will have to invest. When in Janus Capital's opinion such activity would have a disruptive effect on portfolio management, a Portfolio reserves the right to refuse purchase orders and exchanges into a Portfolio by any person, group or commonly controlled account. If a Portfolio allows a market timer to trade Portfolio shares, it may in the future require the market timer to enter into a written agreement to follow certain procedures and limitations."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Aspen Series Institutional Shares Prospectus dated and filed on May 1, 2001 and February 4, 2001, respectively, Shareholder Guide at p. 44; Janus Equity Funds Prospectus, dated and filed July 31,

CAFDC:  04-md-15863-03

89

2001 and June 1, 2001, respectively, Shareholders Manual p. 39 (same except "Portfolio" replaced with "Fund").

413.    The Janus Prospectuses even affirmatively noted that action was taken by the Fund to "deter" market timing or excessive trading. In this regard, the Prospectuses stated:

> "Frequent trades in your account or accounts controlled by you can disrupt portfolio investment strategies and increase Fund expenses for all Fund shareholders. The Funds are not intended for market timing or excessive trading. To deter these activities, the Funds or their agents may temporarily or permanently suspend or terminate exchange privileges of any investor who makes more than four exchanges out of a Fund in a calendar year and bar future purchases into the Fund by such investor. In addition, the Funds or their agents also may reject any purchase orders (including exchange purchases) by any investor or group of investors indefinitely for any reason, including, in particular, purchase orders that they believe are attributable to market timers or are otherwise excessive or potentially disruptive to the Fund.
>
> Orders placed by investors in violation of the exchange limits or the excessive trading policies or by investors that the Fund believes are market timers may be revoked or cancelled by a Fund on the next business day after receipt of the order … Transactions placed through the same financial intermediary on an omnibus basis may be deemed part of a group for the purpose of this policy and may be rejected in whole or in part by a Fund."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Investment Fund – Post Effective Amendment No. 103 & 86, Janus Equity Funds Prospectus, dated and filed February 25, 2002 and February 22, 2002, respectively, Shareholder's Manual at p. 44; Janus Small Cap Value Fund – Prospectus, dated and filed April 17, 2003, Shareholders Manual at 27-28.

414.    More recently, however, comparable statements in the Prospectuses were augmented as follows:

> "The Funds are intended for long-term investment purposes only. The Funds will take reasonable steps to seek to prevent excessive short-term trading. Excessive short-term trading into and out of a Fund can disrupt portfolio investment strategies and may increase expenses, and negatively impact investment returns, for all shareholders, including long-term shareholders who do not generate these costs. The Funds will suspend, and may permanently terminate, the exchange

privilege of any investor who makes more than four round trips (as defined under "Exchange Policies" above) in a Fund in a 12-month period and may bar future purchases into the Fund and any of the other Janus funds by such investor.  In addition, the Funds reserve the right to reject any purchase request (including exchange purchases if permitted by your financial intermediary by any investor or group of investors for any reason without prior notice, including in particular, if they believe that the trading activity in the account(s) would be disruptive to a Fund.  For example, a Fund may refuse a purchase order if the Fund's portfolio manager believes he or she would be unable to invest the money effectively in accordance with the Fund's investment policies or the Fund would otherwise be adversely affected due to the size of the transaction, frequency of trading or other factors.  Transactions placed in violation of the Funds' exchange limits or excessive trading policy are not deemed accepted by a Fund and nay be cancelled or revoked by the Fund on the next business day following receipt by the Fund."

"… However, the Funds cannot always identify or reasonably detect excessive trading that may be facilitated by financial intermediaries or made difficult to identify though the use of omnibus accounts by those intermediaries that transmit purchase, exchange and redemption orders to the Funds.  Transactions accepted by your financial intermediary or plan sponsor in violation of the Funds' excessive trading policy are not deemed accepted by a Fund and may be cancelled or revoked by the Fund on the next business day following receipt by your financial intermediary or plan sponsor."

"The Funds' exchange limits and excessive trading policies generally do not apply to any of the Janus Money Market Funds, although the Janus Money Market Funds at all times reserve the right to reject any purchase request (including exchange purchases) for any reason without prior notice."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Investment Fund, Post Effective Amendment No. 110 & 93, Janus Equity Funds Prospectus, dated and filed February, 2004 and December 23, 2003, respectively, Shareholders Guide p. 56-57.

### **Exchanges**

415.    The Janus Funds' Prospectuses (using substantially the same language and under the heading "Exchanges") emphasize that the exchange privilege (the sale of shares from one Fund and the purchase of shares of another Fund) is not to be used for short-term or excessive trading, which rule reaffirms the Funds' prohibition of frequent trading or market timing:

*"The exchange privilege is not intended as a vehicle for short-term or excessive trading.  The Funds do not permit frequent trading or market timing. Excessive*

*exchanges of Fund shares disrupt portfolio management and drive Fund expenses higher.*  The Fund may suspend or terminate your exchange privilege if you engage in an excessive pattern of exchanges."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Adviser Series – Prospectus, Post Effective Amendments 2&4, dated and filed on July 31, 2001, Janus Adviser Series p. 42 (emphasis in original); Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 6 & 7, dated and filed on September 30, 2002 and September 26, 2002, respectively; Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 7 & 8, dated and filed on December 31, 2002 and October 17, 2002; Janus Adviser Series (Class I Shares, Class C Shares) Prospectus, Post Effective Amendments 12 & 13, dated and filed on 6/2/2003 & 4/3/2003, respectively; Janus Adviser Series (I Shares, C Shares) – Prospectus – Post Effective Amendments 13 & 14, dated and filed on April 17, 2003.

416.    In addition, the Janus Funds' Prospectuses also enumerated the number of exchanges out of each Fund during a calendar year and noted that exchanges in excess of such amount would be considered excessive.

(a)    "You may make four exchanges out of each Fund during a calendar year (exclusive of Systematic Exchange).  Exchanges in excess of this limit are considered excessive trading and may be subject to an exchange fee or may result in termination of the exchange privilege or the right to make future purchases of Fund shares."  Janus Equity Funds – Prospectus, dated and filed on July 31, 2001 and June 1, 2001, Shareholder's Manual p. 37, 43-44.

(b)    "The exchange privilege is not intended as a vehicle for short-term or excessive trading.  You may make up to four round trips in a Fund in a 12-month period,

although the Funds at all times reserve the right to reject any exchange purchase for any reason without prior notice.  A "round trip" is a redemption out of a fund (by any means) followed by a purchase back into the same Fund (by any means).  The Funds will work with financial intermediaries to apply the Funds' exchange limit.  However, the Funds my not always have the ability to monitor or enforce the trading activity in such accounts."  Janus Equity and Income Funds, Post Effective Amendments 100 & 83, dated and filed on July 31, 2001, Shareholder's Guide at p. 53.

(c)      "You may make four exchanges out of each Janus fund (exclusive of Systematic Exchanges) per calendar year.  These limits are designed to deter short-term trading. See our Excessive Trading Policy below for more information."  Janus Investment Fund – Post Effective Amendment No. 103 & 86, Janus Equity Funds Prospectus dated and filed on February 25, 2002 and February 22, 2002, respectively, Shareholder's Manual at 43-44; Janus Small Cap Value Fund – Prospectus, dated and filed on April 17, 2003, Shareholder's Manual at 27.

(d)      The Funds' Prospectuses further noted that if exchanges in excess of the enumerated amount were undertaken, the Funds could reject exchange requests:

i.      "The Funds reserve the right to reject any exchange request and to modify or terminate the exchange privilege at any time."  Janus Equity Funds – Prospectus dated and filed July 31, 2001 and June 1, 2001, respectively, Shareholder's Manual p. 37, 43-44.

ii.      "The Funds reserve the right to reject any exchange request and to modify or terminate the exchange privilege at any time."  Janus Equity and Income Funds, Post Effective Amendments 100 & 83, dated and filed on July 31, 2001, Shareholder Guide page 53-54.

iii.    "The Funds reserve the right to reject any exchanges request and to modify or terminate the exchange privilege at any time."   Janus Investment Fund – Post Effective Amendment No. 103 & 86, Janus Equity Funds Prospectus dated and filed February 25, 2002 and February 22, 2002, Shareholder Manual at 43; Janus Small Cap Value Fund – Prospectus, dated and filed on April 17, 2003, Shareholder Manual at 27.

**Pricing Of Fund Shares**

417.    The Janus Funds' Prospectuses (using substantially the same language and under the heading "Pricing of Fund Shares") set forth how a Fund's NAV would be calculated, and that to receive a day's price the order must be received by the close of the regular trading session of the NYSE, usually 4:00 pm New York time.  In this regard, the Prospectuses stated:

> "All purchases, sales and exchanges will be processed at the NAV next calculated after your request is received and accepted by a Fund (or a Fund's agent or authorized designee).  A Fund's NAV is calculated at the close of the regular trading session of the NYSE (normally 4:00 p.m. New York time) each day that the NYSE is open.  The NAV of Fund shares is not determined on days the NYSE is closed.  In order to receive a day's price, your order must be received by the close of the regular trading session of the NYSE.  Securities are valued at market value or, if a market quotation is not readily available, at their fair value determined in good faith under procedures established by and under the supervision of the Trustees.  Short term instruments maturing within 60 days are valued at amortized cost, which approximates market value."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Equity Funds – Prospectus, dated and filed on July 31, 2001 and June 1, 2001, Shareholder's Manual 41 (page 47-48); Janus Investment Fund – Post Effective Amendment No. 103 & 86, Janus Equity Funds Prospectus dated and filed February 25, 2002 and February 22, 2002, Shareholder Manual at 47 (same except "or authorized designee" follows the phrase "or a Fund's agent"); Janus Small Cap Value Fund – Prospectus, dated and filed on April 17, 2003, Shareholder Manual at 27 (same except "or authorized designee" follows the phrase "or a Fund's agent").

CAFDC:  04-md-15863-03

**Involuntary Redemptions**

418.    The Janus Funds' Prospectuses (using substantially the same language and under the heading "Involuntary Redemptions") characterized "market timing" as an activity which was "illegal or otherwise believed to be detrimental to the Funds" for which activity the Fund could close the account of a shareholder who was engaged in such activity.

> "The Funds reserve the right to close an account if the shareholder is deemed to engage in activities which are illegal or otherwise believed to be detrimental to the Funds, such as market timing."

This statement appeared in at least the following Janus Funds Prospectuses: Janus Investment Fund – Post Effective Amendment No. 103 & 86, Janus Equity Funds Prospectus dated and filed February 25, 2002 and February 22, 2002, Shareholder Manual at 47; Janus Small Cap Value Fund – Prospectus, dated and filed on April 17, 2003, Shareholder Manual at 27.

### (12)    The Janus Trust Declarations[11]

419.    The Janus Aspen Series Amended and Restated Trust Instrument dated and the Janus Adviser Series Amended and Restated Trust Instrument both dated March 18, 2003 state:

> The assets belonging to a Series shall be charged with the liabilities of that Series and all expenses, costs, charges and reserves attributable to that Series, except that liabilities and expenses allocated solely to a particular Class shall be borne by that Class.  Any general liabilities, expenses, costs, charges or reserves of the Trust which are not readily identifiable as belonging to any particular Series or Class shall be allocated and charged by the Trustees between or among any one or more of the Series or Classes in such manner as the Trustees deem fair and equitable. (emphasis added).

### (13)    The Janus Advisory Contracts

420.    The Advisory Agreements between the Advisor and each of the three Trusts, on behalf of the Janus Funds, contain the following, or substantially similar, provisions regarding the duties of the Adviser:

---

[11]    Each contract is available through the SEC EDGAR system available at: http://www.sec.gov/edgar/searchedgar/companysearch.html.

CAFDC:  04-md-15863-03

(a)     furnish continuous advice and recommendations to the Fund as to the acquisition, holding, or disposition of any or all of the securities or other assets which the Fund may own or contemplate acquiring from time to time. [giving due consideration] to the investment policies and restrictions and the other statements concerning the Fund in the Trust Instrument, bylaws, and registration statements under the 1940 Act and the 1933 Act…

(b)     attend meetings and furnish oral or written reports, as the Trust may reasonably require, in order to keep the Trustees and appropriate officers of the Trust fully informed as to the condition of the investment portfolio of the Fund…

(c)     generally monitor and report to Fund officers the Fund's compliance with investment policies and restrictions as set forth in the currently effective prospectus and statement of additional information relating to the shares of the Fund under the Securities Act of 1933, as amended.

<u>Sub-Advisor Agreements</u>

421.    The Sub-Advisory Agreements between Sub-Advisers INTECH, Perkins and Bay Isle and the Adviser (on behalf of, and for the benefit of the Funds) all contain the following, or substantially similar, provisions regarding the duties of the Sub-Advisers:

(a)     manage the investment operations of the Fund …. in conformity with the investment objectives, policies and restrictions and the other statements concerning the Fund in the Trust's trust instrument, as amended from time to time … the bylaws and registration statements under the 1940 Act and the securities Act of 1933, as amended … the Advisers Act, the rules thereunder and all other applicable federal and state laws and regulations. …

(b)     attend meetings and furnish oral or written reports, as the trust or Janus may reasonably require to keep Janus, the Trustees and appropriate officers of the Trust fully informed as to the conditions of the investment portfolio of the Fund…

(c)     In all matters relating to the performance of this Agreement, ….act in conformity with the Trusts Trust Instrument, bylaws and currently effective registration statements under the 1940 Act and the 1933 ACT and any amendments or supplements thereto … and with the written policies, procedures and guidelines of the Fund, and written instructions and directions of the Trustees and Janus and shall comply with the requirements of the 1940 Act, the Advisers Act, the rules thereunder, and all other applicable federal and state laws and regulations.

CAFDC:  04-md-15863-03

### (14)    **Distributor Contracts**

422.    Janus Distributors LLC[12] entered into Distribution Agreements with the various Funds.  The Distribution Agreements required Janus Distributors LLC to sell Fund shares at the current NAV price, and required compliance with applicable state and federal laws and regulations.  The Distribution Agreements provided:

> All solicitations by the distributor pursuant to this Agreement shall be for orders to purchase Shares of a Fund at the public offering price.  The public offering price for each accepted subscription for a Fund's Shares will be the net asset value per share next determined by [Janus Aspen Series] after it accepts such subscription. . .  The net asset value per share of the Shares shall be determined in the manner provided in [Janus Aspen Series's] Declaration of Trust as now in effect or as it may be amended, and as reflected in the then current Prospectus and Statement of Additional Information covering the Shares.

> The Distributor agrees that in soliciting orders to purchase shares it shall duly conform in all respects with applicable federal and state laws and with the rules and regulations of the NASD.

423.    The distribution agreement required share prices to be established in accordance with the then effective prospectuses, which required that purchases made after 4:00 p.m. had to be at the following days NAV.

### (15)    **Administrator Contracts**

424.    Janus Capital Corporation entered into a contractual Fund Administration Agreement with the Janus Investment Fund.  In April 2002 JCC formed JCM which took over the duties in these contracts.  On information and belief, JAD and JAS entered into similar contracts for the funds they held.  The Administration Agreement required the Administrator to

---

[12]    The original Distribution Agreements were between the Funds and Janus Distributors, Inc.  However, the rights and obligations under the Distribution Agreements were transferred to Janus Distributors LLC.  See Form of Transfer and Assumption Agreement, dated April 1, 2002, between Janus Distributors, Inc. and Janus Distributors LLC.

CAFDC:  04-md-15863-03

monitor the Fund's investment policies and restrictions to ensure compliance, and report the efficacy of such efforts. The contract proved that:

> [Janus Capital Corporation] shall provide, or arrange for and supervise the provision by others of the following services to the Fund that are incidental to its operations and business and appropriate for its Class: . . . monitoring and reporting to Fund officers the Fund's compliance with investment policies and restrictions as set forth in the currently effective prospectus and statement of additional information of the Fund.

### (16)    Repercussions to the Janus Funds from Timing

425.    Since September 2003, Janus funds have experienced billions of dollars in net outflows. In the fourth quarter of 2003, net redemptions of long term assets were $7.9 billion; in the first quarter of 2004, the net redemptions were over $5 billion; in June 2004, the net outflow was $1.4 billion; in May 2004 the net outflow was $5.9 billion; in April 2004 the net outflows were $.7 billion. The net redemption of approximately $8 billion in the recently ended quarter exceeded the $4.5 billion in net redemptions which management had expected as announced in Janus' 2003 Annual Report. As of July 2004, Janus had experienced an outflow of $19 billion since September 2003.

426.    As a result of the Janus Defendants' misconduct, Morningstar, Inc., a leading mutual fund research and rating firm, took the unprecedented action on September 12, 2003, of putting a "sell" rating on the Janus family of funds and withdrawing indefinitely any recommendations on Janus Funds. The Morningstar analyst, Brian Portnoy, charged with covering the Janus Funds, was quoted as saying:

> "Some Janus executives allowed timing because they thought Janus's own profitability more important. This was over the objections of others at Janus who opposed selling such timing capacity but ultimately deferred to key sales executives."

***

"Janus placed its own monetary interests ahead of the investors…. The e-mails in the [New York Attorney General's] complaint strongly suggest salespeople at the firm had both the capacity and willingness to steer the company against its fiduciary duties in hopes of making a fast buck, and that key investment personnel were either out of the loop or impotent in stopping it.  Janus has not disputed the allegations and has offered full restitution to harmed shareholders."

\*\*\*

"And now with the disturbing details of the [New York Attorney General] documentation in combination with Janus's uninspiring reaction to the crisis, we've decided to withdraw indefinitely any Janus Funds recommendations we currently have…"

\*\*\*

"Morningstar suggests shareholders in Janus Funds managed in-house should consider moving investments elsewhere, after consideration to tax and sales charges."

427.    Market timing can harm both timed funds and non-timed funds.  One way that market timing injured the Janus Funds was via increased service fees, based on the NAV of the Funds.

### (17)    Fees on Janus Funds

428.    Certain classes of shares in the Janus Funds pay fees to the Distributor, Janus Distributors, LLC.  The Class C Shares and Class I Shares of JAD, Service Shares and Service II Shares of JAS series of funds pay distribution and service related fees under plans adopted pursuant to Rule 12b-1.Such fees are intended to compensate the Distributor for services provided and expenses incurred by it in connection with the offering and sale of the shares of the Funds including the payment by the Distributor to dealers of commissions on the sales. (JIF funds do not pay distribution fees).

429.    JAS, on behalf of the Service Class and Service II Class Shares of JAS, has adopted a distribution plan under Rule 12b-1 under the Investment Company Act, which

provides for a payment of a distribution fee of up to 0.75%, of the daily net assets of the Service

Class and Service II Class Shares.

430.    JAD, on behalf of Class C Shares and Class I Shares of JAD, has adopted a

distribution plan under Rule 12b-1 under the Investment Company Act, which provides for a

payment of a distribution fee of up to 0.75%, of the daily net assets of Class C Shares and Class I

Shares of JAD.

431.    Under the plans, the 12b-1 fees are paid by the Funds out of NAV to the

Distributor.

432.    Janus Distributors received the following fees from JAD funds:

| Name of Fund | 12b-1 Distribution Fees Paid |
|---|---|
| Janus Adviser Aggressive Growth Fund | $ 879,044 |
| Janus Adviser Balanced Fund | $ 841,098 |
| Janus Adviser Capital Appreciation Fund | $ 450,012 |
| Janus Adviser Core Equity Fund | $ 9,962 |
| Janus Adviser Flexible Income Fund | $ 6,775 |
| Janus Adviser Global Value Fund(1) | $ 1,244 |
| Janus Adviser Growth Fund | $ 617,939 |
| Janus Adviser Growth and Income Fund | $ 56,917 |
| Janus Adviser International Fund | $ 711,900 |
| Janus Adviser Money Market Fund | $ 25,610 |
| Janus Adviser Strategic Value Fund | $ 12,681 |
| Janus Adviser Worldwide Fund | $1,742,120 |

433.    Janus Distributors received the following 12b-1 fees from JAS funds:

| Name of Portfolio | 12b-1 Distribution Fees Paid |
|---|---|
| Aggressive Growth Portfolio - Service Shares | $109,438 |
| Balanced Portfolio - Service Shares | $ 34,854 |
| Capital Appreciation Portfolio - Service Shares | $779,070 |
| Core Equity Portfolio - Service Shares | $ 232 |
| Flexible Income Portfolio - Service Shares | $ 467 |
| Global Life Sciences Portfolio - Service Shares | $ 38,984 |

Global Technology Portfolio - Service Shares          $641,079
Global Value Portfolio - Service Shares(1)                  N/A
Growth Portfolio - Service Shares                     $ 74,455
Growth and Income Portfolio - Service Shares          $ 32,169
International Growth Portfolio - Service Shares        $674,201
Money Market Portfolio - Service Shares               $    0
Strategic Value Portfolio - Service Shares            $   721
Worldwide Growth Portfolio - Service Shares           $ 55,395

**Advisory and Administrative Fees**

434.    The Adviser and Sub-Adviser Defendants all receive fees based on the NAV of

the Funds.

435.    JCM is the Adviser for JAS Funds and receives the following advisory fees for its

services.

| Name of Portfolio | Advisory Fee under Current and New Advisory Agreements |
|---|---|
| Aggressive Growth Portfolio | 0.65% |
| Balanced Portfolio | 0.65% |
| Capital Appreciation Portfolio | 0.65% |
| Core Equity Portfolio | 0.65% |
| Flexible Income Portfolio | 0.65% of first $300 million 0.55% over $300 million |
| Global Life Sciences Portfolio | 0.65% |
| Global Technology Portfolio | 0.65% |
| Global Value Portfolio | 0.65% |
| Growth and Income Portfolio | 0.65% |
| Growth Portfolio | 0.65% |
| International Growth Portfolio | 0.65% |
| Money Market Portfolio | 0.25% |
| Strategic Value Portfolio | 0.65% |
| Worldwide Growth Portfolio | 0.65% |

436.    Perkins, the Sub-Adviser for the JAS Mid Cap Value Portfolio, receives a fee

equal to 50% of the advisory fee payable to JCM from the Fund before reduction of the JCM fee

by the amount of the fee payable to PWM.

CAFDC:  04-md-15863-03

437.    Enhanced Investment Technologies, LLC ("INTECH") is the Sub-Adviser to JAS Risk-Managed Large Cap Core Portfolio and receives a fee at an annual rate of 0.26% of the average daily net assets of the Fund for its services.

438.    Bay Isle Financial LLC ("Bay Isle") is the Sub-Adviser to JAS Small Cap Value Portfolio and receives a fee calculated at an annual rate of 0.75% of the Fund's average daily net assets for its services to the Portfolio.

439.    JCM is the Advisor for JAD funds.  JCM receives administrative fees from JAD funds for its services as follows:

| Name of Fund | Advisory Fee under Current and New Advisory Agreements | Advisory Fees Paid |
| --- | --- | --- |
| Janus Adviser Aggressive Growth Fund | 0.65% | $ 879,044 |
| Janus Adviser Balanced Fund | 0.65% | $ 841,098 |
| Janus Adviser Capital Appreciation Fund | 0.65% | $ 450,012 |
| Janus Adviser Core Equity Fund | 0.65% | $    9,962 |
| Janus Adviser Flexible Income Fund | 0.65% of first $300 million | $    6,775 |
|  | 0.55% over $300 million | $    1,244 |
| Janus Adviser Global Value Fund | 0.65% | $ 617,939 |
| Janus Adviser Growth Fund | 0.65% | $  56,917 |
| Janus Adviser Growth and Income Fund | 0.65% | $ 711,900 |
| Janus Adviser International Fund | 0.65% | $  25,610 |
| Janus Adviser Money Market Fund | 0.25% | $  12,681 |
| Janus Adviser Strategic Value Fund | 0.65% | $1,742,120 |
| Janus Adviser Worldwide Fund | 0.65% |  |

440.    Bay Isle is the Sub-Advisor for the Janus Adviser Small Cap Value Fund and receives at an annual rate of 0.75% of the average daily net assets of the Fund.

441.    PWM is the Sub-Advisor of Janus Adviser Mid Cap Value Fund and receives a fee equal to 50% of the advisory fee payable to JCM from the Fund before reduction of the JCM fee by the amount of the fee payable to PWM.

442.    INTECH is the Sub-Advisor of the Janus Risk-Managed Large Cap Growth Fund and receives at an annual rate of 0.26% of the average daily net assets of the Fund.

443.    JCM is the Advisor to JIF funds and receives investment advisory fees for its services.  JCM receives fees from JIF funds as follows:

| Name of Fund | Advisory Fee under Current and New Advisory Agreements |
| --- | --- |
| Janus Balanced Fund | 0.65% |
| Janus Core Equity Fund | 0.65% |
| Janus Enterprise Fund | 0.65% |
| Janus Federal Tax-Exempt Fund | 0.60% of first $300 million<br>0.55% over $300 million |
| Janus Flexible Income Fund | 0.65% of first $300 million<br>0.55% over $300 million |
| Janus Fund | 0.65% |
| Janus Fund 2 | 0.65% |
| Janus Global Life Sciences Fund | 0.65% |
| Janus Global Technology Fund | 0.65% |
| Janus Global Value Fund | 0.65% |
| Janus Government Money Market Fund | 0.20% |
| Janus Growth and Income Fund | 0.65% |
| Janus High-Yield Fund | 0.75% of first $300 million<br>0.65% over $300 million |
| Janus Mercury Fund | 0.65% |
| Janus Money Market Fund | 0.20% |
| Janus Olympus Fund | 0.65% |
| Janus Orion Fund | 0.65% |
| Janus Overseas Fund | 0.65% |
| Janus Short-Term Bond Fund | 0.65% of first $300 million<br>0.55% over $300 million |
| Janus Special Situations Fund | 0.65% |
| Janus Strategic Value Fund | 0.65% |
| Janus Tax-Exempt Money Market Fund | 0.20% |
| Janus Twenty Fund | 0.65% |
| Janus Venture Fund | 0.65% |
| Janus Worldwide Fund | 0.65% |

444.    INTECH is a Sub-Advisor of JIF Janus Risk-Managed Stock Fund and receives for its services a fee at an annual rate of 0.26% of the average daily net assets of the Fund.

**Standing**

445.    The Janus Funds were all created and sponsored by the Adviser.  Their day-to-day activities are managed by the same Adviser or a Sub-adviser who reports to the Adviser.  The Funds have the same Trustees who meet for all of the Funds at once.  All of the sub-contracts for all of the Funds are identical and each is with an affiliate of the Adviser.  The Funds share many expenses between and among one another such as Trustee expenses.  The trade name "Janus" is used to identify the entire Fund complex of each Trust which is traded by the Adviser as an undifferentiated whole.  Plaintiffs therefore bring this action on behalf of all of the Janus Funds.

446.    Paragraphs 447-500 were intentionally left blank.

## V.    DEMAND FUTILITY ALLEGATIONS

501.    The allegations concerning demand futility do not apply to claims asserted by the plaintiffs under Section 36(b) of the ICA, which does not confer a direct right upon the funds or the trusts to bring such claims.

502.    Plaintiffs have not made a demand upon the Trustees of the Funds to bring action against the Adviser, the Distributor, the officers of the Funds, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(a)    No demand is required with respect to plaintiffs' claims under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

(b)    The Trustees are put into office by officers of the Funds or the Adviser, and are not required to stand for election or reelection by shareholders of the Funds except on rare occasions, and thus are not accountable to the shareholders of the Funds.  Rather, the

Trustees effectively serve at the pleasure of the Adviser.  Additionally, the Trustees serve on the boards of virtually all of the Funds of the Fund Family, and are paid for this service with substantial Trustees' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Adviser when the interests of the Adviser may conflict with the interests of the Funds.

(c)     The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Fund, yet have failed to investigate or to do anything to recover for damages caused to the Fund by such activities.  Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the legal actions that have been brought by such authorities, the Trustees have failed to take any action to investigate and have failed to take any action to recover for the Fund the damages cause to it by such unlawful activity.

(d)     Market timing is a phenomenon that has been common knowledge in the mutual fund industry At least since the 1970s.  As early as 1989, the high-profile mutual fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a widely-publicized book, entitled "The Market Wizards," focused attention on market timing.

(e)     Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled "*Mutual Funds Fight the 'Market Timers,'*" the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the Trustees of the Funds.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of

measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

(f)    As stated in an article printed in FORTUNE on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become." See *The Secrets of Eddie Stern*, FORTUNE (April 14, 2004).  The article also noted that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.

(g)    Even though the Trustees have (or should have) had knowledge of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, the Trustees either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would have brought the existence of such unlawful practices in the Funds to their attention.

(h)    Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser that related to the Adviser's management agreement, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby the Adviser facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading are and were, in fact, part of the Adviser's contract.

CAFDC:  04-md-15863-03

(i)      Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15(c) of the Investment Company Act.  Consequently, the Trustees either failed to request all of the "reasonably necessary" information they needed to evaluate the Adviser's contract or they knew about or approved such arrangements with respect to the Fund.

(j)      Indeed, given the Trustees' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the Trustees to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds.  Had the Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds.  However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(k)      The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(l)     On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world.  Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.  Despite that, however, the Trustees have failed to take any action against the Adviser, the Distributor, or any persons responsible for causing harm to the Funds by market timing or late trading.

(m)     The purpose of a demand requirement is to bring matters to the attention of the Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees *already are aware* of the matters about which they should take action to recover damages for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(n)     Because the Trustees have failed for a lengthy time period to take action to recover for the Funds the damages they has suffered because of market timing and late trading,

doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was required but not forthcoming, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

(o)    Given the Trustees' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Directors or Trustees from being able to consider a demand impartially, if one had been made.

(p)    The likelihood of personal liability is even more pronounced in the case of those Trustees who served on the Audit Committee of the Funds, since those members had easy access to the internal documents that revealed the market timing and late trading that harmed the Funds yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

503.    The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Funds, yet have failed to investigate or to do anything to recover for damages caused to the Funds by such activities.  At least since the fall of 2002 several members of the Adviser, Janus Capital Management's senior management received a report commissioned by the JCM CEO which outlined the adverse impacts associated with market timing in mutual funds, identified the fact that JCM had approved market timing

agreements and had recommended that these agreements be terminated. JCM did not terminate its approved market timing relationships at that time and continued to enter into agreements with Market Timers until July 2003.

504.    As a result of these practices, JCM was investigated by the SEC, the New York State Attorney General and the Colorado Attorney General's Offices resulting in fines totaling $100 million ($50 million in disgorgement and civil money penalties in the amount of $50 million), plus $1.2 million to the Colorado Attorney General to be used for investor education and to reimburse that office for the costs of their investigation demand. In a September 3, 2003, letter from Whiston to the shareholders of the Janus Funds – which did not deny any of the facts alleged herein – Janus indicated that it had been "cooperating" with the New York Attorney General's investigation for some time. Clearly, Janus and its hand-picked Trustees had been informed of the wrongdoing alleged herein for a long period of time.

505.    The relationship between fee-gouging and multiple directorships was documented in a study of trustee compensation for 82 of the largest fund families. "[T]he study revealed a disturbing pattern: <u>The more money trustees get, the more shareholders pay in expenses</u>. This unexpected link between trustees' salaries and fund-family expenses raises serious questions about the role independent trustees play in protecting shareholders." Michael Mulvihill, "A Question of Trust" (Morningstar, Inc. 1996) (emphasis added). In addition to serving as a trustee overseeing 58 portfolios operated by Janus, McCalpin is also the Executive Vice President and COO of The Rockefeller Brothers Fund, among other activities. In addition to serving as a trustee overseeing 58 portfolios operated by Janus. McCarter is President and CEO of The Field Museum of Natural History, among other activities. In addition to serving as a trustee overseeing 58 portfolios operated by Janus, Mullen is a director of Red Robin Gourmet Burgers,

Inc.  In addition to serving as a trustee overseeing 58 portfolios operated by Janus, Rothe is a

Professor of Business, University of Colorado, and Principal of a venture capital firm.   In

addition to serving as a trustee overseeing 58 portfolios operated by Janus, Stewart is Corporate

Vice President and General Manager of a manufacturer of vacuum fittings and valves.

506.    Paragraphs 507-600 were intentionally left blank.

## COUNT I

### VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT
### (Against The Adviser And Distributor Defendants)

601.    Plaintiff incorporates by reference paragraphs 1 through 600 above, but not

paragraphs 501 through 600 relating to demand, as if set forth herein.

602.    The Trusts, the Nominal Defendants, are registered investment companies within

the meaning of the ICA.

603.    The Adviser and the Sub-Adviser is an investment adviser for the Funds as that

term is defined in Section 2 of the ICA.

604.    The Distributor Defendant, Janus Distributors, LLC is an affiliate of the Adviser

Defendant for purposes of Section 36(b) of the ICA.

605.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment

adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due

care with respect to the receipt of compensation for services or payments of a material nature

paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary

duties apply not only to the terms of the advisory fee agreements, but also to the manner in

which advisers seek approval of such agreements.

606.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and

owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to its receipt

CAFDC:  04-md-15863-03

of compensation for services or payments of any material nature paid by the Funds or its

shareholders to the Adviser or any affiliated person.  Those fiduciary duties include, but are not

limited to, the duty of the Adviser to seek approval of any advisory agreement upon full

disclosure of all information material to the Trustees' decision regarding the Adviser's

compensation.

607.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment

adviser of a mutual fund owes to the mutual fund the duty to furnish the trustees of the fund

"such information as may reasonably be necessary to evaluate the terms of any contract whereby

a person undertakes regularly to serve or act as investment adviser of such [mutual fund]

company."

608.    Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the

Adviser from soliciting the approval of any advisory agreement from the Funds or the Trustees

by use of false or misleading information, or by failing to disclose information material to the

Trustees' decision regarding the Adviser's compensation.  Information concerning conflicts of

interest, the nature and extent of market timing and late trading in the Funds, the nature and

extent of capacity arrangements for market timing and late trading in the Funds, and the

Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect

and prevent, market timing and late trading in the Funds, are particularly important to the Funds

and to their independent trustees.

609.    After a reasonable opportunity to conduct discovery, plaintiffs believe the

evidence will show that, for any of the Funds, the Adviser Defendant and its affiliates did not

make full and fair disclosure of all information that would be material to the Trustees' decision

regarding fees and/or other compensation under advisory and/or other agreements, including in

particular the Adviser Defendant's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

610.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Janus Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendant's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

612.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

613.    The Adviser Defendant and the Distributor Defendant, as its affiliate, breached his, her, or its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

614.    By agreeing and/or conspiring with the market timers to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Adviser Defendant and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.    As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.    By virtue of the foregoing, the Adviser has violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT II

### VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT
### (Against Adviser Defendants, And Distributor Defendants and Janus Capital Group)

618.    Plaintiff incorporates by reference all paragraphs 1 through 600 above, but not paragraphs 500 through 600 relating to demand, as if set forth herein.

619.    The Trusts and the Janus Funds are registered investment companies.

620.    The Adviser Defendants, JCM is an investment adviser under Section 36(a) as that term is defined in Section 2 of the ICA.

621.    The Distributor Defendant Janus Distributors, LLC acts as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

622.    This paragraph intentionally left blank.

CAFDC:  04-md-15863-03

623.    Defendants JCG, the Officer and Director Defendants and the Trustee Defendants, by virtue of their ownership and position and responsibilities for managing and directing the activities of the Adviser Defendant, the Distributor Defendant, are liable for the actions of those entities.

624.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendant, the Distributor Defendant, and the Trustee Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the advisers to seek approval of any advisory agreement will full disclosure of information material to the Trustee's decision regarding their compensation and the duty of the trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the Trustees of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendant and the Distributor Defendant did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such

information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.   After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendant's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.   Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party."  Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), any advisory agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.   The Adviser Defendant, the Distributor Defendant, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

631.   By agreeing and/or conspiring with the Timer Defendants to permit and/or encourage the Timer Defendants to time the Funds, the Adviser Defendant and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**COUNT III**

**VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT**
**(Against the Adviser Defendants and Distributor Defendant)**

633.     Plaintiff incorporates by reference all paragraphs 1 through 600 above as if set forth herein.

634.     Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

635.     For the reasons alleged herein, the agreements between or among the Adviser, JCM, the Distributor, Janus Distributors LLC and the Janus Funds, and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

636.     Under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), the advisory agreements and the 12b-1 Plans may be voided and the Adviser Defendant and the Distributor Defendant are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

**COUNT IV**

**VIOLATION OF SECTIONS 206 AND 215 OF THE INVESTMENT ADVISERS ACT**
**(Against The Adviser Defendant and the Distributor Defendant)**

637.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

638.    The Adviser Defendant JCM and the Distributor Defendant Janus Distributors LLC are investment advisers within the meaning of the IAA.

639.    The Trusts and the Funds are clients of the Adviser Defendant and the Distributor Defendant within the meaning of Section 206 of the IAA.

640.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

641.    The Adviser Defendant and the Distributor Defendant have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendant and the Distributor Defendant facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to the trustee's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

642.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment adviser agreement made or approved in violation of any provision of the IAA, including the investment

adviser agreements between the Adviser Defendant or the Distributor Defendant and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

643.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT V

### CONTROL PERSON LIABILITY UNDER SECTION 48 OF THE INVESTMENT COMPANY ACT (AGAINST JANUS CAPITAL GROUP)

644.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

645.    Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

646.    The Control Person Defendants JCG, the Officer and Director Defendants and the Trustee Defendants directly or indirectly, caused the Adviser Defendant and the Distributor Defendant to engage in the unlawful conduct alleged herein.

647.    Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendants are liable for causing, directly or indirectly, the Adviser Defendant and the Distributor Defendant to engage in the unlawful conduct alleged herein.

648.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which Control Person Defendants are liable.

## COUNT VI

## COMMON LAW BREACH OF FIDUCIARY DUTY
(Against The Adviser Defendant and the Distributor Defendant)

649.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

650.    The Adviser Defendant, JCM, the Distributor Defendant, Janus Distributors LLC, and the Trustee Defendants (the "Fiduciary Defendants"), and each of them, owe and owed to the Janus Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

651.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

652.    As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

653.    As alleged above, each of the Fiduciary Defendants also breached his, her, or its fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

654. As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VII

### BREACH OF CONTRACT
### (Against Adviser, Sub-Adviser, and Other Defendants)

655. Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

656. The Trusts, JIF, JAD, and JAS, on behalf of the Janus Funds and the Adviser, JCM entered into Investment Advisory Contracts.

657. The Janus Funds have fully performed their obligations under the Investment Advisory Agreement.

658. Substantially similar language in all the Investment Advisory Agreements for the Funds required and requires the Adviser to:

(a) furnish continuous advice and recommendations to the Fund as to the acquisition, holding, or disposition of any or all of the securities or other assets which the Fund may own or contemplate acquiring from time to time. [giving due consideration] to the investment policies and restrictions and the other statements concerning the Fund in the Trust Instrument, bylaws, and registration statements under the 1940 Act and the 1933 Act…

(b) attend meetings and furnish oral or written reports, as the Trust may reasonably require, in order to keep the Trustees and appropriate officers of the Trust fully informed as to the condition of the investment portfolio of the Fund…

(c) generally monitor and report to Fund officers the Fund's compliance with investment policies and restrictions as set forth in the currently effective prospectus and statement of additional information relating to the shares of the Fund under the Securities Act of 1933, as amended.

659.    The Sub-Adviser Agreements between the Sub-Advisers and the Adviser, on

behalf of the Funds, all contain substantially similar language which required and requires the

Sub-Advisers to:

(a)    manage the investment operations of the Fund …. in conformity with the investment objectives, policies and restrictions and the other statements concerning the Fund in the Trust's trust instrument, as amended from time to time … the bylaws and registration statements under the 1940 Act and the securities Act of 1933, as amended … the Advisers Act, the rules thereunder and all other applicable federal and state laws and regulations. …

(b)    attend meetings and furnish oral or written reports, as the trust or Janus may reasonably require to keep Janus, the Trustees and appropriate officers of the Trust fully informed as to the conditions of the investment portfolio of the Fund…

(c)    In all matters relating to the performance of this Agreement, ….act in conformity with the Trusts Trust Instrument, bylaws and currently effective registration statements under the 1940 Act and the 1933 ACT and any amendments or supplements thereto … and with the written policies, procedures and guidelines of the Fund, and written instructions and directions of the Trustees and Janus and shall comply with the requirements of the 1940 Act, the Advisers Act, the rules thereunder, and all other applicable federal and state laws and regulations.

660.    The Distributor and JCM, on behalf of the Funds entered into Distribution

Agreements containing substantially similar language which required and request the Distributor

to:

All solicitations by the distributor pursuant to this Agreement shall be for orders to purchase Shares of a Fund at the public offering price.  The public offering price for each accepted subscription for a Fund's Shares will be the net asset value per share next determined by [Janus Aspen Series] after it accepts such subscription. . .  The net asset value per share of the Shares shall be determined in the manner provided in [Janus Aspen Series's] Declaration of Trust as now in effect or as it may be amended, and as reflected in the then current Prospectus and Statement of Additional Information covering the Shares.

The Distributor agrees that in soliciting orders to purchase shares it shall duly conform in all respects with applicable federal and state laws and with the rules and regulations of the NASD.

661.    The Administrator, JCM entered into Administration Agreements with the Trusts, for the benefit of the funds, containing substantially similar language which required and require JCM to:

[Janus Capital Corporation] shall provide, or arrange for and supervise the provision by others of the following services to the Fund that are incidental to its operations and business and appropriate for its Class:  .  .  . monitoring and reporting to Fund officers the Fund's compliance with investment policies and restrictions as set forth in the currently effective prospectus and statement of additional information of the Fund.

662.    Advisor breached the Investment Advisory Agreements by the wrongful acts alleged in this Complaint.

663.    The Distributor breached the Distribution Agreements by the wrongful acts alleged in this Complaint.

664.    The Sub-Advisers breached the Sub-Adviser Agreement by the wrongful acts alleged in this Complaint.

665.    The Administrator breached the Administration Agreements by the wrongful acts alleged in this Complaint.

666.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements, the sub-advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Advisor, Sub-Advisor, and Distributor, Defendants are liable.

## COUNT VIII

**BREACH OF CONTRACT
(Against Certain Additional Defendants)**

667.     Plaintiffs incorporate by reference paragraphs 1 through 600 above as if set forth

herein.

668.     Upon information and belief, throughout the relevant period, BAS and the

Adviser, JCM, were parties to written or oral sales agreements governing BAS's duties as

Broker-Dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

669.     The Funds, for whose benefit the Adviser entered into the Dealer Agreements, are

intended third-party beneficiaries of the Dealer Agreements.

670.     There is implied in all agreements an obligation of good faith and fair dealing

pursuant to which neither party make take any action that will deliberately frustrate the other

party's purpose in entering into the contract.

671.     Upon information and belief, in the Dealer Agreements, BAS expressly agreed to

clear mutual fund orders through the NSCC's Fund SERV system and to transmit orders that are

received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a

certain time the next business day ("Day 2").  Under the Dealer Agreements, BAS and the

Adviser agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades

would be priced at the Day 2 NAV.

672.     BAS had an express or implied obligation to comply with the federal securities

laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the

forward pricing rule.

673.     In breach of the express or implied terms of the Sales Agreements, and in

violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and

CAFDC:  04-md-15863-03

timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted the Funds identified in Exhibit C hereto to be late traded and timed to the detriment of the funds.

674.    Accordingly, BAS has breached its Dealer Agreements with the Adviser.

675.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

### COUNT IX

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against The Timer Defendants[13] and Additional Defendants and BAS)**

676.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

677.    The Timer Defendants and BAS knew of the existence and extent of the fiduciary duties owed by the Fiduciary Defendants to the Funds.  The Timer Defendants and BAS knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

678.    BAS allowed for the use of their instrumentalities, including the BAS box, for purposes of market timing and late trading.

679.    The Timer Defendants and BAS maliciously, without justification and through unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary

---

[13] The timer Defendants are:  BOA; BAS, the CIBC Defendants; Canary; Arum; Harder; Smith Barney; Pritchard; Trautman and WSG.

CAFDC:  04-md-15863-03

Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

680.    The Timer Defendants and BAS are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein.

681.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

### UNJUST ENRICHMENT
### (Against All Defendants)

682.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

683.    All Defendants received a benefit in the profits they earned as a result of their unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

684.    Justice and equity require that all Defendants not be allowed to retain those profits.

685.    Justice and equity require that all Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

CAFDC:  04-md-15863-03

## COUNT XI

### COMMON LAW INTERFERENCE WITH CONTRACT
### (Against the Timer Defendants[14], Additional Defendants and BAS)

686.    Plaintiff incorporates by reference paragraphs 1 through 685 above as if set forth herein.

687.    JCM and the Janus Funds are parties to the Investment Advisory Agreement.

688.    The Adviser breached the Investment Advisory Agreement in the manner and by the actions described in this Complaint.

689.    The Timer Defendants knew of the existence of the Investment Advisory Agreement between the JCM and the Janus Funds and knew its terms.

690.    The Timer Defendants knowingly and intentionally induced the Adviser to breach that contract and interfered with the Adviser's present and future performance of the Investment Advisory Agreements by their acts of wrongdoing as described in this Complaint, intending to and proximately causing the described breaches of the Investment Advisory Agreement.

691.    The Timer Defendants carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment Advisory Agreements and cause such  breaches of the Investment Advisory Agreements, and did in fact cause breaches of the Agreements.

692.    The conduct of the Timer Defendants was improper and without justification or privilege.

693.    As a direct and proximate result of the Timer Defendants' wrongful conduct, the Timer Defendants are jointly and severally liable to the Funds with the Adviser for injuries and damages the Funds have suffered and which they will continue to suffer and is liable for actual and punitive damages.

---

[14] Timer Defendants as used in this Count is the same as Count IX above.

CAFDC:  04-md-15863-03

## COUNT XII

### CIVIL CONSPIRACY
### (Against All Defendants)

694.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

695.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

696.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

697.    The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

698.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

699.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Adviser Defendant and the Distributor Defendant;

C.      Rescinding the management and other contracts for the Funds with the Columbia

Defendants;

D.      Rescinding the 12b-1 Plans adopted by the Funds;

E.      Ordering Defendants to disgorge all management fees and other compensation

paid to the Adviser and all profits earned on unlawful trading and all management and other fees

earned during the period of such trading,

F.      Awarding monetary damages against all of the Defendants, individually, jointly,

or severally, in favor of the Funds, for all losses and damages suffered as a result of the

wrongdoings alleged in this Complaint, including punitive damages where appropriate, together

with interest thereon,

G.      Awarding Plaintiffs the fees and expenses incurred in this action, including

reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.      Granting Plaintiffs such other and further relief as the Court may deem just and

proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by

jury of all issues so triable.

Dated:  September 30, 2004                    CHIMICLES & TIKELLIS, LLP


                                             By:    ____/s/_____
                                                    Nicholas E. Chimicles
                                                    Michael D. Gottsch
                                                    Denise Davis Schwartzman
                                                    M. Katherine Meermans
                                                    Timothy N. Mathews
                                                    361 West Lancaster Avenue
                                                    Haverford, PA  19041
                                                    (610) 642-8500

CAFDC:  04-md-15863-03

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
Daniel W. Krasner
Mark C. Rifkin
Demet Basar
Christopher S. Hinton
Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

POMERANTZ, HAUDEK, BLOCK,
 GROSSMAN & GROSS, LLP
Stanley M. Grossman
H. Adam Prussin
100 Park Avenue
New York, NY  10017
(212) 661-1100

*Fund Derivative Plaintiffs' Executive
Committee*

LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue
New York, NY  10110
(212) 608-1900

SQUITIERI & FEARON, LLP
420 Fifth Avenue, 18th Floor
New York, NY  10175
(212) 421-6492

*Fund Derivative Plaintiffs'
Steering Committee*

ABBEY GARDY LLP
212 East 39th Street
New York, NY  10016
(212) 889-3700

CAFDC:  04-md-15863-03

CHITWOOD & HARLEY LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 873-3900

FARUQI & FARUQI, LLP
320 East 39th Street
New York, NY 10016

FINKELSTEIN, THOMPSON &
LOUGHRAN
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
(202) 337-8000

LAW OFFICE OF KLARI NEUWELT
110 East 59th Street, 29th Floor
New York, NY 10022
(212) 593-8800

 LAW OFFICES OF JAMES V. BASHIAN,
P.C.
500 Fifth Avenue, Suite 2700
New York, NY 10110
(212) 921-4110

WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
(212) 935-7400

***Fund Derivative Plaintiffs' Counsel***